IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, on behalf of the estate of
LEMINGTON HOME FOR THE AGED,                    10cv800

                                                **ELECTRONICALLY FILED**
                    Plaintiff,

        v.

ARTHUR BALDWIN, et al.,

                    Defendants.


## MEMORANDUM OPINION

## I.      Introduction

        Plaintiff, Official Committee of Unsecured Creditors (Committee), on behalf of the estate

of Lemington Home for the Aged (Lemington), brought a three count complaint against

defendants, all former directors and officers of Lemington, alleging breach of fiduciary duty and

loyalty through self-dealing, and deepening of insolvency.[1]  Plaintiff claims that defendants acted

in bad faith and were motivated by self-dealing when they decided to cease admissions and close

Lemington, and that they improperly decided the time to file for bankruptcy.  Additionally,

Plaintiff asserts that the Board of Directors intended to redirect funds obtained from a charitable

foundation to Lemington's non-debtor related entities, which the Board had a direct, vested

interest in.

        Defendants have filed a Joint Motion for Summary Judgment arguing that the business

judgment rule and the doctrine of *in pari delicto* shield them from any potential liability, and that

the claim for deepening insolvency is not recognized as an independent cause of action.

---

[1] This case was originally filed in Bankruptcy Court for the Western District of Pennsylvania, but was transferred as
an Adversary Proceeding before this Court.

After careful consideration of the pending Joint Motion for Summary Judgment (doc. no. 288), and response thereto (doc. no. 293 and 302), the Court will GRANT defendants' Joint Motion for Summary Judgment for the reasons that follow.

## II. Standards of Review

### Federal Rule of Civil Procedure 56(c)(2)

Summary judgment is only proper when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c)(2); *Horn v. Thoratec Corp.*, 376 F.3d 163, 165 (3d Cir. 2004). In reviewing a motion for summary judgment, the role of the court is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009). If so, summary judgment will not be granted.

The district court must view all of the facts in the light most favorable to the non-moving party, who is entitled to "every reasonable inference that can be drawn from the record," and if "there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Reedy v. Evanson*, --- F.3d ----, 2010 WL 2991378, *8 (3d Cir. 2010) (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) and *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). A party cannot, however, defeat a motion for summary judgment by pointing to fragmentary inferences that could be massaged to support her position. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. Factual Background

The parties have amassed over 35 pages of "concise material facts," and the Court has gleaned the following factual history.

Lemington, a Pennsylvania, non-profit corporation, was a personal care facility dedicated to caring for primarily African-American senior citizens and was the oldest African-American sponsored nursing home, until its closure in July 2005. Doc. No. 289 ¶ 20; Doc. No. 290 ¶ 1; Doc. No. 301 ¶ 1. The facility opened in 1892 and saw extraordinary growth in the 1980s, when bed capacity was increased from 30 patients to 180 patients. Doc. No. 290 at ¶¶ 1, 2; Doc. No. 301 at ¶ 2. Lemington also experienced frequent financial and operational difficulties during this period of growth that continued until closure. Doc. No. 290 ¶ 3. Defendants, all directors and officers of Lemington, owned "vested interests in Lemington Elder Care Services, Lemington Community Services, Lemington Residential Corporation #1, and Lemington Residential Corporation #2 (collectively Related Entities)." Second Amended Complaint ¶ 38.

In 1996, Lemington's Board of Directors (the Board) decided to end its relationship with an outside management firm and hire an executive director, Melody Causey (Causey). Doc. No. 290 ¶¶ 4, 5. Causey's original contract titled her as "President/CEO" and her second contract of November 2000, titled her as "Executive Director" of the newly established parent/affiliate Lemington Elder Care (LEC). Doc. No. 301 at ¶ 5. Additionally, from 1998 to 2003, the Board authorized a series of consultant studies funded by the Pittsburgh Foundation (which was Lemington's primary source of charitable funding) including a nursing home consultant, an accounting firm, and a medical records/billing consultant. *Id.* at ¶ 6; Doc. No. 290 ¶ 6. While defendants alleged that the purpose of these hirings was to aid in the formulation of a business plan, enhance operations, and ensure proper billing, Doc. No. 301 ¶¶ 6, 7, plaintiff disagrees and

contends that these professionals were hired "for the sole purpose of assisting Defendants in their efforts to cause [Lemington's] insolvency and create a blueprint for the future operations and shifting of resources to the Related Entities." Second Amended Complaint ¶ 47(d). Further, plaintiff contends that these studies advised the Board on current operational deficiencies, suggested corrective measures, and suggested alternatives, such as selling Lemington to prospective suitors, or removing Causey as Administrator. Doc. No. 301 at ¶ 6. The personal care facility became financially insolvent during fiscal year 1999. *Id.* at ¶ 8.

Subsequent audits in 2002 and 2003 listed Lemington as a "going concern." *Id.* at ¶¶ 8-10.[2] Plaintiff also notes that Lemington also received a $178,300.00 grant from the Pittsburgh Foundation to be put toward hiring a Nursing Home Administrator, but Causey never used the grant to find a replacement. *Id.* at ¶ 8.

On April 3, 2002, a mortgage was obtained by Lemington through Midland Loan Services, which was eventually assigned to TouchStone Partners. Doc. No. 290 ¶ 62.

A legal committee was formed in March 2004 to advice on the issue of bankruptcy. Doc. No. 301 ¶ 12. Then, in a May 13, 2004, e-mail to the Board, Causey recommended Lemington file bankruptcy. Doc. No. 290 ¶ 11. In response, the Board held a special meeting on May 17, 2004 at which defendant Arthur Baldwin and other "key" board members did not attend. Doc. No. 301 ¶ 12, 13.

At the May 17, 2004 meeting Director Brian Parker (Parker), an attorney at the law firm of McGuire Woods who was also a personal friend of Baldwin, stated that he would ask the McGuire Woods firm, if they would advise Lemington on a pro bono basis. *Id.* at ¶ 13; Doc. No. 290 ¶ 14. Plaintiff contends that McGuire Woods did, in fact, bill and was compensated for its

---

[2] A "going concern" notice "advises that continued viability of an enterprise is in doubt." Doc. No. 289 ¶ 5. Specifically, Lemington's 2002 audit declared its "total liabilities exceeded total assets by $1,941,959" while its 2003 audit declared its "total liabilities exceeded total assets by $1,675,397." Doc. No. 290 ¶¶ 9, 10.

work. Doc. No. 301 ¶ 14. The parties also dispute the purpose of McGuire Woods' involvement. While plaintiff contends that "[d]efendants directed the law firm of McGuire Woods LLC to perform legal services on behalf of [Lemington] and the Related Entities and utilized [only Lemington's] bank account to pay the Related Entities' legal fees," Second Amended Complaint ¶ 47(e), defendants claim that they hired McGuire Woods to advise it regarding the financial and legal issues confronting it. Doc. No. 290 ¶¶ 14, 17. Defendant contends that the Board subsequently agreed to retain the services of McGuire Woods, but plaintiff disagrees and states that there is "no indication of a quorum or vote to authorize action," because only 10 out of 16 directors were present. Doc. No. 290 ¶ 17; Doc. No. 301 ¶ 17.

The Board convened again on May 27, 2004, and Parker stated that McGuire Woods was attempting to contact creditors to discuss potential settlement options, which, if successful, would obviate the need to file bankruptcy. Doc. No. 290 ¶¶ 15, 16. Consequently, at this time, McGuire Woods advised against filing for bankruptcy based upon: "Lemington's image and involvement with the community; and . . . the belief that Lemington could resolve necessary financial issues short of a bankruptcy filing." *Id.* at ¶¶ 18, 20.

The Board held another meeting on June 24, 2004 at which the progress of creditor settlement was discussed. *Id.* at ¶ 21. The Board also discussed borrowing funds from the Lemington Trust, which the Pittsburgh Foundation funded and administered. *Id.* at ¶ 22. The Pittsburgh Foundation had historically been Lemington's principal source of charitable funds and had been a significant factor in the continued sustainability of Lemington. *Id.* at ¶¶ 3, 22. Causey and Shealey, on behalf of Lemington, considered either borrowing $1 million from the Trust's corpus or using the corpus as collateral for a loan. *Id.* at ¶ 23. However, the Foundation

was hesitant about a potential loan because of Lemington's arduous financial situation. *Id.* at ¶ 24.

Approximately a month later, at the July 22, 2004 Board meeting, Causey offered a report explaining the attempt to obtain additional financing from the Pittsburgh Foundation's Trust. *Id.* at ¶ 25. Additionally, Parker made a motion, which the Board accepted unanimously, to take two corresponding courses of action. *Id.* at ¶ 26. First, the Board would hold meetings to "discuss the filing for bankruptcy and to develop a plan for reorganization [not liquidation] by August 15, 2004." *Id.* Second, to enter into discussions with the president of the University of Pittsburgh Medical Center (UPMC) and West Penn Allegheny Health System (West Penn) within 30 days to discuss partnership opportunities. *Id.* at ¶ 27.

While plaintiff claims that "[s]ome of these buyers had a plan to take over [Lemington's] operations," Second Amended Complaint ¶ 37, defendants state that in fall 2004, these discussions ensued and a confidentiality agreement was entered into with UPMC so due diligence could be performed. Doc. No. 290 ¶¶ 27, 28. Later, in December 2004, the Board became aware that Causey had not been working for Lemington on a full time basis for the past six months (Causey allegedly advised Baldwin of her seizure condition) and subsequently voted to terminate her employment for "failing to perform duties." *Id.* at ¶ 30. *See also* Doc. No. 301 at ¶ 101.

Additionally, on December 17, 2004, Elaine Carrington (Carrington), the second resident in less than six months died (the first resident being Terry Norwood), suggesting neglect by Lemington nursing personnel. Doc. No. 290 ¶ 45. The Pennsylvania Department of Health conducted a subsequent investigation and concluded, on December 28-30, 2004, that "[b]ased upon findings of the investigation into the death of resident, it is determined that the

Administrator, Mel Causey, lacks the qualifications, the knowledge of the PC regulations and the ability to direct staff to perform personal care services as required." *Id.* at ¶ 46.

While plaintiff attempts to cast the Board as incompetent, defendant contends (and plaintiff admits) that the Board received reports from both Causey and Shealey at each Board meeting, including the meetings that took place in January 2005 at which the death of Carrington was discussed. Doc. No. 301 ¶¶ 82-119; Doc. No. 290 ¶ 35.

In January 2005, the Board made a final decision to close Lemington. Doc. No. 290 ¶ 29. While plaintiff asserts that the closure of Lemington was based upon the Board's awareness and fear of criminal prosecution over the death of Carrington (which happened to be the second suspicious death at Lemington), defendants state that the closure was precipitated because it was "no longer able to fulfill its mission . . . to serve the greater good of the community . . . [as such] the appropriate action is to cease the operations." *Id.* at ¶¶ 31, 33; Doc. No. 301 ¶ 75.

According to defendants, the Board continued its efforts to find an entity for Lemington to merge with even after closure. Doc. No. 290 ¶ 29. Plaintiff argues to the contrary and states that Shealey "was intent on closing the home and had no intention of allowing anyone else to take over the home." Doc. No. 301 ¶ 29. Plaintiff also states that the "Board rushed to closure without apparent regard to the bankruptcy law." *Id.* at ¶ 135(j). Ultimately, on April 13, 2005, Lemington filed for Chapter 11 bankruptcy and closed the nursing home's doors in July 2005, relocating its residents to other facilities. Doc. No. 289 ¶¶ 19, 20; Doc. No. 301 ¶¶ 19, 20.

A July 2005 study by Primus Care which was performed by Order of the Bankruptcy Court "reported that the discharge planning directors of UPMC Shadyside, UPMC Presbyterian, UPMC Braddock, West Pennsylvania Hospital and Mercy Hospital all indicated that it would be beneficial to [Lemington's] interest to stay open and beneficial to the community due to . . .

insufficient nursing home beds in Allegheny County." Second Amended Complaint ¶ 32, Ex. C. *See also* Doc. No. 301 at ¶ 135.

Plaintiff also asserts defendants allowed "some or all of the Related Entities to utilize [Lemington's] bank account(s), employees, office space, cash and other accounts," as well as allowed "in excess of $400,000 of Medicare receivables to go unbilled for approximately one year." Second Amended Complaint ¶ 54 (e),(j).

### **Plaintiff's Concise Counter-Statement of Facts**

In its "concise" counter-statement of facts, plaintiff submits over twenty (20) pages of facts which plaintiff alleges are "material" and were "omitted" from defendant's statement of facts. The Court will not recount all of these "facts" mainly because many of them are not material and contain conclusions of law.[3] Instead, the Court will attempt to summarize plaintiff's factual recitations in a reduced format below.

Plaintiff contends that all directors of Lemington were simultaneously directors of parent/affiliate Lemington Elder Care (LEC) Services, the alleged intended recipient of the "transfers in question." Doc. No. 301 ¶ 64. Director Parker, who was never named as a defendant in this case, sat simultaneously as a director on both Boards of Lemington and LEC Services. *Id.* at ¶ 69.

Plaintiff also contends that counsel simultaneously represented Lemington and LEC Services. *Id.* at ¶ 66. LEC Services allegedly usurped Lemington's charitable lending sources with the United Way of Allegheny County and the Pittsburgh Foundation before and during the Lemington bankruptcy, and this fact was not divulged to the Bankruptcy Court or to creditors. *Id.* at ¶¶ 67-68.

---

[3] Where appropriate, the Court has included plaintiff's alleged counter facts in the main text of factual background section above. Although defendants have not responded to plaintiff's counter-statement of facts, the Court will view them in the light most favorable to plaintiff.

Plaintiff argues that Causey failed to timely search for a "seasoned, competent licensed nursing home Administrator," despite the instructions from the Board and the consultant's recommendation that she do so. *Id.* at ¶ 79. Causey also allegedly failed to give notice to the Board of her diagnosed seizure condition and physician ordered part-time work status. *Id.* at ¶ 80.

Plaintiff states that the Board received numerous warning over several years that management of Lemington was deficient, as was evidenced by the downgrade to provisional license, the ban on admissions, and an assessment of $208,000.00 for "chronic deficiency citations" that took place in 1998 (less than one year after Causey was hired). *Id.* at ¶ 82.

Plaintiff also states that Lemington and LEC Services Boards' Office of Treasurer sat vacant from November 2003 to January 2005, and the new Treasurer-elect in January 2005 resigned after several weeks, because "no one wanted to step-up." *Id.* at ¶ 84.

Plaintiff further contends that the Board was unaware on September 29, 2004 of Lemington's provisional license, even after the death of Norwood, until reading about it in the newspaper. *Id.* at ¶ 85. Director Andiorio, former President of Mercy Health System, opined in her September 29, 2004 email to other Directors that the Board was vulnerable on governance responsibilities as to finances and resident care. *Id.* at ¶ 88.

Auditors and HUD allegedly complained to Causey about Shealey's failure to timely supply requested financial information. *Id.* at ¶ 95. According to Causey, the Board was aware as early as March 2004, that Shealey was not paying employee's health insurance premiums, causing coverage to be cancelled on the employees. *Id.* at ¶ 95, 96, 98. Baldwin testified that as of December 2004 or early 2005 he had some knowledge of Shealey's failure to maintain the accounting system. *Id.* at ¶ 114.

Causey testified in her deposition that she told Board members Baldwin and Duncan as early as May 2004 of her seizure condition and limited, part-time work status.  *Id.* at ¶ 99

Board meeting attendance was often below 50%, and at least one Director, Nicole Gaines, failed to participate in a single meeting over several years.  *Id.* at ¶ 108.

The decision to close Lemington on January 6, 2005 was made without a viability study.  Every consultant to look at the home in 2005 opined that it was viable if mismanagement was corrected.  According to plaintiff, interested bidders were delayed in receiving information for their "due diligence" until the Board was well on the way to closing Lemington.  *Id.* at ¶ 135.

## III.    Discussion

### A.    Count I – Breach of Fiduciary Duty: Duty of Loyalty – Self-Dealing; Count II – Breach of Fiduciary Duty: Duty of Care

Directors and officers in a non-profit corporation have a fiduciary duty to the corporation.  15 P.S. §§ 5712(a), (c) (1995).  As such, directors and officers owe the corporation a duty of care and duty of loyalty.  *Warehime v. Warehime*, 777 A.2d 469, 482 (Pa. Super. Ct. 2001), order rev'd on other grounds, 860 A.2d  41 (Pa. 2004) (citing *Anchel v. Shea*, 762 A.2d 346, 357 (Pa. Super. Ct. 2000)).  Plaintiff alleges defendants, former directors and officers of a non-profit corporation, breached their fiduciary duty to the corporation by bad faith and self-dealing, as well as recklessness and gross negligence.  Second Amended Complaint ¶¶ 49, 56.

Specifically, plaintiff contends defendants breached their fiduciary duty of care primarily by poor financial decisions, poor management, and allowing over $400,000.00 of Medicare receivables to go unbilled for a year.  *Id.* at ¶ 54.  Plaintiff alleges defendants breached their fiduciary duty of loyalty primarily by closing Lemington when it would have been beneficial to remain open, ceasing negotiations with potential buyers, and attempting to shift resources from Lemington to the Related Entities (LEC).  *Id.* at ¶ 47.

A director and officer's duty of care necessitates performance of their duties "in good faith, in a manner [they] reasonably [believe] to be in the best [interest] of a corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." *Id.* (citing 15 P.S. § 5712(a)).

A director and officer's duty of loyalty necessitates no self-dealing. *Id.* As such, officers and directors must dedicate their efforts to the corporation's business, aiming to advance the "common interests and not their own; they cannot directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed by their fellow shareholders." *Tyler v. O'Neill*, 994 F. Supp. 603, 612 (E.D. Pa. 1998) (citing *In re Athos Steel & Aluminum, Inc.*, 71 B.R. 525, 540 (Bankr. E.D. Pa. 1987)). The test for determining liability resulting from a breach of fiduciary duty is "whether the officer, director, or shareholder was unjustly enriched by their actions." *Id.* (citing *In re Insulfoams, Inc.*, 184 B.R. 694, 707 (Bankr. W.D. Pa. 1995)).

Defendants counter plaintiff's breach of fiduciary duty claim by arguing, *inter alia*, the business judgment rule, and the doctrine of *in pari delicto* shield them from any potential liability. Doc. No. 289 ¶¶ 24, 50, 58.

### 1. Business Judgment Rule

Courts have recognized that directors and officers must be given wide discretion in the management of a corporation's business affairs and have thus developed the business judgment rule. *Enterra Corp. v. SGS Associates*, 600 F. Supp. 678, 685 (E.D. Pa. 1985). The business judgment rule shields an officer or director of a corporation from liability for:

> a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation.

*Cuker v. Mikalauskas*, 692 A.2d 1042, 1045 (Pa. 1997).

The rationale behind the rule is that it encourages those capable of becoming directors by shielding them from liability for judgment errors, and recognizes the risks inherent in business decisions. *Id.* at 1046 (citing *Weiss v. Temp. Inv. Fund, Inc.*, 692 F.2d 928, 941 (3d Cir. 1982); *Cramer v. Gen. Tel. & Electronics Corp.*, 582 F.2d 259, 274 (3d Cir. 1978)). It gives directors the extensive discretion to set policies without judicial or shareholder interference, and keeps courts out of difficult business decisions that courts are not prepared to handle. *Id.*

The rule is applicable to both mistakes of fact and law. *Cramer,* 582 F.2d at 274. Additionally, the rule is a rebuttable presumption that directors and officers "are better equipped than the courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted in good faith." *Cuker*, 692 A.2d at 1045-46 (quoting *Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co.*, 496 N.E.2d 959, 963-64 (Ohio 1986)). To rebut the presumption, "[t]he burden is on the party challenging the directors' decision . . . to establish facts that rebut the presumption." *In re: NutriSystem, Inc.*, 666 F. Supp. 2d 501, 512 (E.D. Pa. 2009) (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

### i. The Directors

Plaintiff alleges the Board failed to supervise the officers and made a decision to stop admitting new patients at Lemington in January 2005 when a report indicated it would be beneficial for Lemington to remain open. Second Amended Complaint ¶¶ 32-35, 54. The Board asserts the business judgment rule shields them from liability in both situations. Doc No. 289 ¶ 30.

Important factors to consider in determining whether the business judgment rule is applicable are: "whether the board . . . was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith)." *Lemenestrel v. Warden*, 964 A.2d 902, 912 (Pa. Super. Ct. 2008).

The Board argues plaintiff makes only a bare assertion of bad faith and self-dealing and ignores significant actions taken by it prior to closure. Doc No. 289 ¶ 34. Specifically, the Board contends that when Causey recommended bankruptcy on May 17, 2004, it subsequently met 8 times between that time and closure. Doc. No. 290 ¶¶ 11, doc. no. 289 ¶ 34. The McGuire Woods law firm was retained to advise Lemington about the financial and legal issues confronting it, initially advising not to close Lemington, which the Board adhered to. Doc. No. 290 ¶¶ 14, 17. Discussions were entered into with several prominent regional hospitals about the possibility of merger. *Id.* at ¶¶ 27, 28. An unsuccessful attempt was made to secure a loan from the Pittsburgh Trust. *Id.* at ¶ 24.

As such, the Board maintains it "made a rational, considered and good faith decision - - based upon issues of resident safety and a dire financial picture - - to cease the admissions of residents in January of 2005." Doc. No. 289 ¶ 42.

Plaintiff counters by arguing it has established facts sufficient to rebut the business judgment rule's presumption. Plaintiff primarily alleges the Board was not disinterested because "[a]ll Director-Defendants of Debtor Lemington Home for the Aged (LHA) were simultaneously also Directors of the parent/affiliate Lemington Elder Care Services (LEC)," who was the intended recipient of "the transfers in question (funding from charitable donors and trusts)."

Doc. No. 302 ¶ 6.  Plaintiff also contends the McGuire Woods law firm was operating under a conflict of interest because it was representing both Lemington and LEC, entities that had conflicting interests.  *Id.* at ¶ 8.  Plaintiff argues the Lemington bankruptcy was facilitated to shift $2.5 million of the Lemington Home Fund to LEC.  *Id.* at ¶ 9.  Furthermore, plaintiff asserts Attorney Parker was a personal friend of Director Arthur Baldwin (Baldwin) and was brought to sit on both Boards, while Parker's law firm, McGuire Woods, provided simultaneous legal advice to both entities.  *Id.* at ¶ 10.  Lastly, plaintiff contends the Board "had no interest in letting anyone else take over Lemington."  *Id.* at ¶ 13.

Viewing the facts in the light most favorable to plaintiff, the Court concludes that plaintiff has not established facts sufficient to rebut the presumption of the applicability of the business judgment rule.  There is simply no evidence to demonstrate that the Board acted in bad faith, and while their decisions, in hindsight, might have been less than perfect, they acted with reasonable diligence and attempted, with the advice of counsel and other consultants, for many years to "right" the ship prior to the ultimate decision to close Lemington and file for bankruptcy.  The Board conducted regular meetings, recorded minutes, and required the Officers to report on the state of affairs at the meetings.  There is simply no evidence that the Board did not have the best interests of Lemington in mind when it discharged its responsibilities, including the ultimate closure of Lemington.

### ii. The Officers

Plaintiff alleges the Officer Defendants were grossly negligent and/or reckless with the company's financial information and that such gross negligence and/or recklessness proximately caused the unnecessary filing of bankruptcy and the decision to cease patient admissions when it would have been beneficial to continue admitting patients.  Doc. No. 302 ¶¶ 38, 40.

Specifically, plaintiff alleges defendant Chief Financial Officer, Shealey was allowed "to produce wildly inaccurate Pro Forma Financial Statements for distribution to UPMC and other potential suitors," information that UPMC deemed untrustworthy. *Id.* at ¶ 29. Plaintiff contends auditors had complained to Causey about Shealey's "failure to supply requested financial information." *Id.* at ¶ 31. Additionally, plaintiff claims the Board "continued to rely entirely on Shealey for financial information until Shealey left, after receipt of . . . [a] Report to the Board . . . . describing the systematic failure of the finance department under Shealey, including $500,000.00-$700,000.00 in un-submitted Medicare billings, apparently because a Chapter 11 would be filed resulting in closure of the Home." *Id.* at ¶ 40. Thus, plaintiff argues "[t]he 'Transition Plan' process embraced by 'the Board' contemplated the reorganization of LEC outside of bankruptcy at the expense of LHA and its creditors in bankruptcy." *Id.* at ¶ 42. This is why, plaintiff claims, "interested bidders were delayed in receiving information for their 'due diligence' until the Board was well on the way to closing the Home." *Id.* at ¶ 52.

Defendant Officers counter by arguing the business judgment rule shields them from any potential liability, as their actions were "taken in good faith and in furtherance of corporate interests." Doc. No. 289 ¶¶ 45, 48. They assert that testimony established that, although the financial records were "were not in great shape, that would not prevent UPMC from making a decision one way or the other as to its interest in merging and/or otherwise acquiring the home." *Id.* at ¶ 46. Additionally, Officer Directors contend that Susan Bouffard, a medical records consultant, was hired to assist Lemington bill Medicaid and/or Medicare for services never billed for. *Id.* at ¶ 47.

For the business judgment rule to apply, "directors must inform themselves prior to making a business decision of all the material information reasonably available to them and act

with requisite care in discharging their duties." *In re: NutriSystem, Inc.*, 666 F. Supp 2d at 512 (citations omitted). The standard of care "requires only that directors not act with gross negligence or reckless disregard." *Id.* A court must then examine "'the substantive nature of the challenged transaction' against 'the factual background alleged in the complaint' and determine if the facts alleged create a reasonable doubt that the transaction was the result of a valid exercise of business judgment." *Id.* (quoting *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984), *overruled in non-pertinent part by*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

The Court finds that plaintiff has failed to set forth any facts from which a reasonable trier of fact could find that defendant Officers acted with reckless disregard or with gross negligence in discharging their duties. At most, the facts evidence mere negligence, but the standard of care required by the business judgment rule is greater than ordinary negligence. The business judgment rule therefore, is applicable and therefore, shields the Officers from liability.

### 2. *In Pari Delicto*

*In pari delicto* is a common-law defense deriving its name from the Latin phrase, *in pari delicto potior est condition defendentis*, which means "'[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'" *Bateman Eichler, Hill Richards, Inc., v. Berner*, 472 U.S. 299, 306 (1985) (citing *Black's Law Dictionary* 711 (5th ed. 1979)). The defense rests on two bedrock principles: (1) "courts should not lend their good offices to mediating disputes among wrongdoers;" and (2) "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.* at 306. The defense has been interpreted broadly to bar "actions where plaintiffs simply have been involved generally in 'the same sort of wrongdoing' as defendants." *Id.* at 307 (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 138 (1968)).

Pennsylvania has followed the classic common-law formulation of the defense and specifically requires "the plaintiff be an active, voluntary participant in the wrongful conduct or transaction(s) for which it seeks redress, and bear 'substantially equal [or greater] responsibility for the underlying illegality' as compared to the defendant." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterHouseCoopers, LLP,* 989 A.2d 313, 329 (Pa. 2010) (citation omitted).

The law of agency plays a key role in the practical application of the defense. *Id.* at 333. Generally, wrongful conduct by individual officers and directors of a corporation "can be imputed to the corporation only if the conduct was committed: (1) in the course of [the officer or directors] employment and (2) for the benefit of the corporation." *In re: Total Commitment, Inc.*, 335 E.R. 589, 621 (Bankr. E.D. Pa. 2005) (citing *Official Comm. Of Unsecured Creditors v. R.F. Laugherty & Co., Inc.*, 267 F.3d 340, 358-59 (3d Cir. 2001)). Additionally, "in actions brought by the trustee as a successor to the debtor's interest . . . the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor . . . [and conversely] the trustee is, of course, subject to the same defenses as have been asserted by the Defendant had the action been instituted by the debtor." *Laugherty*, 267 F.3d at 356 (citation omitted).

Here, Defendant Officers and Directors assert that Lemington, through the Official Committee of Unsecured Creditors, is trying to recover damages "for the actions taken by its officers and directors that were in furtherance of the mission of Lemington for which they did not receive a personal benefit." Doc. no. 289 ¶ 51. Defendants further contend that plaintiff's expert testimony established they did not receive any personal benefit from the closure of Lemington. *Id.*

Plaintiff counters by arguing the *in pari delicto* defense does not apply when "Debtor has not substantially benefitted from the wrongful acts of insiders [the Adverse Interest Exception]." Doc. no. 302 ¶ 74. Plaintiff argues Defendant Officers and Directors' wrongful conduct proximately caused "grave and irrevocable harm to [the] Debtor," thereby triggering the adverse interest exception. *Id.*

While the imputation doctrine "recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority," imputation will not generally be attributed when "an agent acts in his own interest, and to the corporation's detriment." *PriceWaterHouseCoopers,* 989 A.2d at 333 (citation omitted). The major controversy over application of the exception in a given fact scenario is the "degree of self-interest required [to warrant application of the exception] or, conversely, the quantum of benefit to the corporation necessary to avoid the exception's application (where self-interest is evident)." *Id*

In *PriceWaterHouseCoopers*, the Pennsylvania Supreme Court offered some guidance to assess such conflicting concerns: "[T]he appropriate approach to benefit and self-interest is best related back to the underlying purpose of imputation, which is fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations." *Id.*

In addition to this Court's finding that the business judgment rule shields defendants from liability, this Court concludes that the doctrine of *in pari delicto* is applicable to the present case and shields defendants from liability.

Plaintiff seeks redress for defendants' alleged wrongful actions in closing Lemington. Defendant Directors and Officers were agents of Lemington. Viewing the facts in the light most favorable to plaintiff, this Court concludes that defendants' actions were conducted in furtherance of their fiduciary duties to Lemington. There are simply no facts by which a

reasonable trier of fact could conclude that defendants' received any personal benefit from its decision to close Lemington. As such, the level of self-interest necessary to trigger the adverse interest exception has not been met and the doctrine of *in pari delicto* shields the defendants from any potential liability.

## B. Count III – Deepening Insolvency

Although the Pennsylvania Supreme Court has not decided the issue, the United States Court of Appeals for the Third Circuit has predicted that deepening insolvency is recognized as an independent cause of action under Pennsylvania law where it causes damages to corporate property. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 351 (3d Cir. 2001). The Court of Appeals for the Third Circuit has defined deepening insolvency as "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Id.* at 347. The rationale behind the theory is that:

> prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets . . . [and] these harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt.

*Id.* at 350.

Only conduct constituting fraud "will suffice to support a deepening insolvency claim under Pennsylvania law." *In re CitX Corp., Inc.*, 448 F.3d 672, 681 (3d Cir. 2006). As such, the Court of Appeals for the Third Circuit has held that "a claim of negligence cannot sustain a deepening-insolvency cause of action." *Id.*

Plaintiff argues that "[d]efendants' actions and omissions constitute fraud, which resulted in the deepening insolvency of the Debtor's business." Second Amended Complaint ¶ 61. Specifically, plaintiff alleges defendants' stopped admitting patients to Lemington in January 2005 to knowingly cause Lemington "significant financial harm," used Lemington's funds "to

pay very expensive attorneys' fees, accountants' fees, and other consultants' fees to shift resources to the Related Entities, failed to collect over $400,000 in Medicare funds, misrepresented to the Bankruptcy Court that they were pursuing a purchaser for Lemington when they allegedly were not, and "concealed their misuse of Debtor's funds by intentionally not disclosing the aforementioned expenditures on the Debtor's monthly operating reports, thereby fraudulently increasing the Debtor's debts." *Id.* at ¶ 61 (a)-(h).

Defendants' counter by arguing that Pennsylvania law does not recognize an independent cause of action for deepening insolvency and plaintiff is not able to establish any of the elements of fraud. Doc. No. 289 ¶ 65.

While the Pennsylvania Supreme Court has not yet definitely ruled on whether deepening insolvency will be recognized as an independent cause of action in the Commonwealth, such a determination is irrelevant to proper adjudication of this case. Judging the facts in the light most favorable to plaintiff, as required, plaintiff has failed to create a material issue of fact regarding the claims of fraud. There are simply no facts by which a reasonable trier of fact could find that defendants committed or precipitated any type of fraud. At most, their actions amount to negligence, but in order to support a claim for deepening of insolvency, plaintiff must create a genuine issue of fact sufficient to establish the elements of fraud. *Lafferty,* 267 F.3d at 358-59.[4]

---

4 Defendants also argue that plaintiff's claims against Causey and Shealey fail as a matter of law because there are no material facts to establish any acts or omissions by either which resulted in the bankruptcy filing by Lemington, defendant Linda Cobb must be dismissed as plaintiff has failed to seek substitution of Ms. Cobb's estate, and plaintiff is barred from recovering as an item of damages the loss allegedly suffered by the mortgage holder. Doc. No. 289 ¶¶ 50, 53, 64, 65. Plaintiff does not dispute that Linda Cobb must be dismissed as plaintiff has failed to seek substitution of Ms. Cobb's estate, and therefore, the Court will grant summary judgment as to Ms. Cobb on this basis as well. Doc. No. 302 ¶ 87. However, having granted summary judgment for all defendants on the basis of the business judgment rule and doctrine of *in pari delicto*, this Court will not address defendants' arguments against Mel Causey and James Shealey or arguments against the loss allegedly suffered by the mortgage holder.

## IV.     Conclusion

For the reasons set forth hereinabove, the Court will GRANT defendants' joint motion for summary judgment (doc. no. 288) on all three counts of the Second Amended Complaint based upon the business judgment rule and the doctrine of *in pari delicto*.  An appropriate order follows.


**SO ORDERED**
<u>s/Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge


cc:     All ECF registered counsel