IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of LEMINGTON HOME FOR THE AGED, )<br><br>Plaintiff, )<br><br>v. )<br><br>ARTHUR BALDWIN; JEROME BULLOCK; ANGELA FORD; JOANNE ANDIORIO; J.W. WALLACE; TWYLA JOHNSON; NICOLE GAINES; WILLIAM THOMPKINS; ROY PENNER; MEL CAUSEY; JAMES SHEALEY; RENEE FRAZIER; CLAUDIA ALLEN; EUGENE DOWNING; GEORGE CALLOWAY; B.J. LEBER; and REVEREND RONALD PETERS, )<br><br>Defendants. ) | 10cv800<br>**ELECTONICALLY FILED** |

## MEMORANDUM OPINION RE: DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR A REMITTITUR (DOC. NO. 646)

**I. Introduction**

This prolonged litigation began on May 26, 2006, with the filing of an adversary

proceeding in the United States Bankruptcy Court for the Western District of Pennsylvania by

the Official Committee of Unsecured Creditors, on behalf of Lemington Home for the Aged

("Plaintiff") against former Officers and Directors of Lemington Home for the Aged

("Defendants"[1]).  Doc. No. 1.  On August 26, 2006, this Court denied Defendants' Motion to

Withdraw the Reference.  *Official Comm. of Unsecured Creditors ex rel. Lemington Home for*

---

[1] There are 17 Defendants.  Fifteen Defendants are former members of the Board of Directors of
Lemington Home for the Aged ("the Home") and two are former officers of Lemington Home
for the Aged.  The Court will refer to the 17 Defendants collectively as "Defendants," to the 15
former directors as "Director Defendants," to the two former officers as "Officer Defendants,"
and to individual Defendants by their last names.

*the Aged v. Baldwin (In re Lemington Home for the Aged)*, 06cv931, (W.D. Pa. Aug. 26, 2006). On June 10, 2010, the United States Bankruptcy Court for the Western District of Pennsylvania transferred the case to this Court. Doc. No. 279.

On October 25, 2010, this Court granted summary judgment to Defendants on all of Plaintiff's claims. *Official Comm. of Unsecured Creditors ex rel. Lemington Home for the Aged v. Baldwin (In re Lemington Home for the Aged) ("Lemington I")*, 2010 WL 4275252 (W.D. Pa. Oct. 25, 2010). The United States Court of Appeals for the Third Circuit reversed, holding that there was sufficient evidence to support Plaintiff's claims and that the case had to proceed to a jury trial. *Official Comm. of Unsecured Creditors ex rel. Lemington Home for the Aged v. Baldwin (In re Lemington Home for the Aged) ("Lemington II")*, 659 F.3d 282 (3d Cir. 2011).

On October 31, 2011, the Court set the case for trial. After an extended and deliberative pre-trial process, and on the eve of trial, Defendants filed a Petition for Leave to File an Interlocutory Appeal and a Petition for Writ of Mandamus on the basis of time limits for trial set by this Court. On March 23, 2012, the United States Court of Appeals for the Third Circuit dismissed Defendants' Petition for Leave to File an Interlocutory Appeal for lack of jurisdiction. *Official Comm. of Unsecured Creditors ex rel. Lemington Home for the Aged v. Baldwin (In re Lemington Home for the Aged)*, 11-8098 (3d Cir. Mar. 23, 2012). On November 26, 2012, the United States Court of Appeals for the Third Circuit denied Defendants' Petition for Writ of Mandamus. *In re Baldwin*, 700 F.3d 122 (3d Cir. 2012).[2]

---

[2] Defendants sought 48 hours per side (for a total of 96 hours) to try this case in their Petition for Writ of Mandamus. In its Opinion, the United States Court of Appeals for the Third Circuit "urged" this Court to increase the time allotted for trial. Thus, upon remand, the Court heeded the directive of the Court of Appeals and increased the amount of time allotted to Plaintiff and Defendants and stated that time limits would be reconsidered during trial if appropriate. *See Official Comm. of Unsecured Creditors ex rel. Lemington Home for the Aged v. Baldwin (In re Lemington Home for the Aged)*, 2013 WL 309975 (W.D. Pa. Jan. 25, 2013). During trial,

The case proceeded to a jury trial on February 19, 2013, and lasted six days. At the close of Plaintiff's case-in-chief, this Court granted Director Defendants' Motion for Judgment as a Matter of Law as to Count I- Duty of Loyalty, denied Officer Defendants' Motion for Judgment as a Matter of Law as to Count I, and denied all Defendants' Motion for Judgment as a Matter of Law as to Count II- Duty of Care and Count III- Deepening Insolvency. Doc. No. 585. Following the close of Defendants' case-in-chief, the Court granted Plaintiff's unopposed Motion for Judgment as a Matter of Law as to the defense of *in pari delicto*. Doc. No. 599. The Court denied all other Motions for Judgment as a Matter of Law made during the trial. Doc. No. 599.

After three days of deliberation, the jury returned a verdict against 15 of the 17 Defendants (all but Defendants Frazier and Allen), jointly and severally, in the amount of $2,250,000. The jury also awarded punitive damages in the amount of $350,000, individually, against Director Defendants Baldwin, Bullock, Andiorio, Johnson, and Thompkins. The jury awarded punitive damages in the amount of $1 million against Officer Defendant Shealey and $750,000 against Officer Defendant Causey. In total, the jury awarded $5,750,000 in damages to Plaintiff. Doc. No. 606.

Currently before the Court is Defendants' Motion for Judgment as a Matter of Law, New Trial, or a Remittitur (Doc. No. 646) which will be DENIED for the reasons set forth below.

---

Defendants asked for an additional 50 minutes. Doc. No. 586. The Court allotted Defendants an extra 60 minutes. Doc. No. 588. No party requested any further increase in the amount of time to present evidence. Plaintiff used approximately 10 hours and 45 minutes of its 13 hour allotment and Defendants used approximately 13 hours and 52 minutes of their 16 hour allotment, for a total of about 25 hours, or approximately 25% of the initial requested time by Defendants. Doc. No. 656, 112-13.

**II. Judgment as a Matter of Law – All Counts**

    **A. Standard of Review**

Defendants are entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), if after the close of evidence, "there is no legally sufficient evidentiary basis for a reasonable jury to find for" Plaintiff. *Rhone Poulenc Rorer Pharms. Inc. v. Newman Glass Works*, 112 F.3d 695, 697 (3d Cir. 1997). If the record contains even "the minimum quantum of evidence upon which a jury might reasonably afford relief," the verdict must be sustained. *Buczek v. Continental Cas. Ins. Co.*, 378 F.3d 284, 288 (3d Cir. 2004) (quoting *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 299 (3d Cir. 2002)); *see also Marion v. TDI Inc.*, 591 F.3d 137, 146 (3d Cir. 2010); *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009).

A motion for judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. *Wittekamp v. Gulf & W. Inc.*, 991 F.2d 1137, 1141 (3d Cir. 1993).

As set forth by the United States Court of Appeals for the Third Circuit:

> In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citations and internal quotation marks omitted); *see also Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991); *Perkin-Elmer Corp. v. Computervision Crop.*, 732 F.2d 888, 893 (3d Cir. 1984).

**B. Discussion**

### 1. Deepening Insolvency – Count III[3]

Defendants first contend that they are entitled to judgment as a matter of law with respect to Count III, deepening insolvency. As raised in pre-trial motions, Defendants again argue that a claim for deepening insolvency has not been recognized in Pennsylvania. This Court is bound by the precedential prediction of the United States Court of Appeals for the Third Circuit that the Pennsylvania Supreme Court would adopt such a cause of action. *Cohen v. Sikirica*, 487 B.R. 615, 629 n.9 (W.D. Pa. 2013) (citing *Konold v. Superior Int'l Indus. Inc.,* — F.Supp.2d —, 2012 WL 5381700, *10 (W.D. Pa. Oct. 31, 2012)). Furthermore, "[i]t is axiomatic that on remand for further proceedings after [a] decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." *EEOC v. Kronos Inc.*, 694 F.3d 351, 361 (3d Cir. 2012) (second alteration in original) (quoting *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985)). The United States Court of Appeals for the Third Circuit has held that a claim for deepening insolvency may be advanced against the directors and officers of a non-profit such as the Home. *Lemington II*, 659 F.3d at 294 & n.6. Thus, the law of the case doctrine requires this Court to recognize a claim for deepening insolvency as a viable cause of action.

Next, the Court will address Defendants' other arguments in support of their Motion for Judgment as a Matter of Law as to Count III.

---

[3] Defendants argue that "Plaintiff has admitted it did not prove the requisite elements of deepening insolvency." Doc. No. 674, 1. However, Plaintiff sufficiently argued in its brief that "[t]he finding of Deepening Insolvency was proper." Doc. No. 671, 3.

*a. Amount of Insolvency as of January 6, 2005*

The United States Court of Appeals for the Third Circuit has stated that in order to recover on a claim for deepening insolvency, Plaintiff must show "that the directors' actions caused the deepening of insolvency." *Lemington II*, 659 F.3d at 294 (citing *In re CitX Corp.*, 448 F.3d 672 (3d Cir. 2006)). Defendants argue that Plaintiff's claim for deepening insolvency fails as a matter of law because Plaintiff failed to prove the change in the debt, or amount of the insolvency, from January 6, 2005, (the date upon which Plaintiff argued that Defendants should have declared bankruptcy) as required. Defendants do not cite any authority in support of this argument.[4]

First, the Court finds that Plaintiff was not required to prove the amount of increased debt caused by Defendants' actions in order to succeed on its claim for deepening insolvency. While proof of such increased debt would certainly assist in proving causation, it is not necessary. The jury heard evidence that the Home continued to accrue increased indebtedness from January 6, 2005. The jury also heard evidence that potential buyers were concerned about the mounting

---

[4] Although not cited by Defendants, the Court finds *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n*, 274 F.3d 924, 935-36 (5th Cir. 2001), worthy of discussion. In that case, the United States Court of Appeals for the Fifth Circuit discussed the trend of other Courts to recognize a claim for deepening insolvency when a party creates the "false appearance of solvency in an insurance company or other financial institution." *Id*. The Court of Appeals did not discuss deepening insolvency in other businesses, such as non-profits. Furthermore, the Court of Appeals did not set forth a standard for deepening insolvency under Texas law. *Id*. Instead, it stated that no case had ever recognized the cause of action in Texas. *Id*. However, the Court of Appeals found that it did not need to reach the question of whether the cause exists in Texas and thus never set forth a standard for recovery under Texas law. *Id*. Without a clear statement as to what a Plaintiff would be required to prove in order to recover under Texas law, it is impossible to discern whether the cause of action that the United States Court of Appeals for the Fifth Circuit was considering mirrored the one that the United States Court of Appeals for the Third Circuit has predicted the Pennsylvania Supreme Court would adopt. Therefore, the Court declines to adopt the United States Court of Appeals for the Fifth Circuit's reasoning as it relates to the requirement to prove the change in insolvency to recover on a claim for deepening insolvency.

debt. Doc. No. 654, 196. Thus, it was reasonable for the jury to conclude that, but for the increase in debt, a potential buyer may have been found, and the Home could have avoided liquidation. This constitutes sufficient evidence for the jury to reasonably conclude that the increased debt caused a definite harm, thereby satisfying the standard as articulated by the United States Court of Appeals for the Third Circuit.

Second, the Court finds there was ample evidence of the increased debt presented at trial. Indeed, the narrative that Defendants presented during trial was that the Home had been taking on additional debt, above and beyond the point of insolvency, for decades. It is inconsistent for Defendants to present evidence that the Home continued to accrue debt as a defense against liability and then argue in this post-trial Motion that this same evidence should not have been considered for the deepening insolvency claim.

Furthermore, the email from the Home's bankruptcy attorney demonstrates that he believed sending out notices to residents of the Home would have adverse consequences with respect to the underlying bankruptcy. P-131 ("I am obligated to advise you that the decision to send out the Notice to Residents has bankruptcy legal implications.[] If we send the notice without consulting with Touchstone and other parties in interest we are likely to be met with Motions from [creditors] saying we have not conducted an open process, have mismanaged and neglected the management, have not maintained financial records and have not discharged our fiduciary duties."). This evidence, although circumstantial, is also sufficient to demonstrate the causation element necessary for damages when considering a Rule 50 motion.

Although Defendants argue that Plaintiff did not prove the causation element of this claim, their argument is without merit. As discussed in further detail in Section III(B)(2), the Court instructed the jury that in order for damages to be awarded, Plaintiff had to prove that

Defendants actions caused the damages. Therefore, the jury's verdict against Defendants necessitated a finding that Defendants' actions caused those damages.

The Court finds instructive the case of *Crowley v. Chait*, 2004 WL 5434953 (D. N.J. Aug. 25, 2004). In *Crowley*, the United States District Court for the District of New Jersey denied a motion for summary judgment on a claim for deepening insolvency. *Id*. at *22. The plaintiff attempted to recover the full amount of the insolvency from all the defendants. *Id*. at *2. The plaintiff argued that a run-off could have occurred, and the insolvency would not have been deepened, but for the actions of the defendants. *Id*. The Court found that the plaintiff could present that theory to the jury. *Id*. The run-off in *Crowley* and the potential purchase in this case are similar in that both would possibly have been able to recover the full amount of the insolvency but for the deepening of the insolvency by the defendants. Specifically, the Court finds that Plaintiff has presented sufficient evidence, especially the going concern testimony, Doc. No. 654, 60, that the Home could have recovered and become viable again but for the deepening insolvency. Thus, the exact amount of the change in the amount of the insolvency is immaterial and did not have to be proven by Plaintiff.

### b. Element of Fraud

Defendants next argue that there was insufficient evidence of fraud to prove deepening insolvency. In *Lemington I*, this Court granted Defendants' Motion for Summary Judgment because the Court concluded that there was insufficient evidence of fraud. *Lemington I*, 2010 WL 4275252 at *11-12. However, the United States Court of Appeals for the Third Circuit disagreed and found that there was sufficient evidence of fraud such that a reasonable jury could find for Plaintiff. *Lemington II*, 659 F.3d at 293–95. The United States Court of Appeals for the Third Circuit set forth the standard for fraud in Pennsylvania as follows:

[F]raud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage.

*Id*. at 294 (quoting *In re Reichert's Estate*, 51 A.2d 615, 617 (Pa. 1947)).

The United States Court of Appeals for the Third Circuit found that the following evidence, when considered in the light most favorable to Plaintiff, was sufficient to meet the above standard for fraud: the failure of the Board to timely disclose its decision to close the Home in January 2005; the omission of certain information from a required debtor-in-possession bankruptcy filing; Officer Defendants' continued comingling of funds of the Home and related entities; Officer Defendants' continued breach of their fiduciary duties; Officer Defendants' continued contracts with vendors; and Officer Defendants' failure to collect Medicare receipts. *Id*. at 294-95.

### *i. Director Defendants*

Plaintiff presented substantial evidence at trial to support all of these allegations of fraud. The parties stipulated that "[o]n January 6, 2005[,] the Board of Directors decided to close the Home and to cease admitting new residents. The Board's pre-bankruptcy decision to close and wind up its affairs was not disclosed to creditors, governmental authorities, or the Bankruptcy Court." Doc. No. 597, ¶¶ 39-40. As the United States Court of Appeals for the Third Circuit recognized in *Lemington II*, 659 F.3d at 294, evidence demonstrated that the Board informed other organizations of the plan to close the Home prior to the bankruptcy filing. This was supported at trial by the introduction of Plaintiff's Exhibits 88 and 89. The record also indicates that the Board did not include specific financial information in its monthly debtor-in-possession bankruptcy filing. The parties stipulated that "[o]n May 11, 2005, the Lemington Home received

Nursing Home Assessment Tax payments of almost $1.4 million." Doc. No. 597, ¶ 52. This information was not disclosed in the May, June, July, or August 2005 reports. P-138- P-141. A reasonable inference is that these funds, if disclosed to the creditors and the Bankruptcy Court, could have helped to avert the shuttering of the Home. These two facts, combined with the continuing breach of their fiduciary duties as discussed *infra*, constitutes more than sufficient evidence for the jury to find that the Director Defendants deepened the insolvency of the Home. *Lemington II*, 659 F.3d at 294-95.

### ii. Officer Defendants

Turning to the Officer Defendants, as detailed more fully *infra*, evidence was presented at trial that both Officer Defendants continually breached their fiduciary duties. As Defendant Causey testified on direct examination, Officer Defendants continued to contract with vendors after the Home had decided to close but before filing for bankruptcy. Doc. No. 654, 188. Defendant Shealey testified that he was responsible for hundreds of vendors and that he input some of the bills from those vendors into his "spreadsheet," but failed to maintain a general ledger. Doc. No. 653, 35. Officer Defendants also failed to collect Medicare receipts.

In sum, Defendants have attempted to re-litigate the decision of the United States Court of Appeals for the Third Circuit that the evidence available was sufficient to raise a material issue of fact for the jury to decide. That argument is not appropriate in a Rule 50 motion being made upon remand. Plaintiff presented evidence to the jury that the United States Court of Appeals for the Third Circuit previously held was sufficient to support a finding of liability against Defendants on this cause of action. Therefore, when taken in the light most favorable to Plaintiff, this evidence is sufficient to sustain the jury's verdict. Therefore, Defendants' Motion for Judgment as a Matter of Law with respect to the deepening insolvency claim, Count III, will

be denied.

## 2. Duty of Care – Count II

Plaintiff alleged, at Count II, that all Defendants breached their fiduciary duty of care owed to the Home. This Court granted Defendants' Motion for Summary Judgment on the duty of care. *Lemington I*, 2010 WL 4275252 at *8-10. On appeal, the United States Court of Appeals for the Third Circuit reversed, holding that there was sufficient evidence for the duty of care claim to proceed to trial. *Lemington II*, 659 F.3d at 290-93.

### a. Director Defendants

The Home had a bylaw provision protecting its Directors from certain legal claims; therefore, in order to prove that a Director Defendant breached his or her duty of care, Plaintiff was required to show that the individual's actions constituted self-dealing, willful misconduct, or recklessness. There was more than sufficient evidence, when taken in the light most favorable to Plaintiff, that the jury could properly find that 13 of the 15 Director Defendants (all but Defendants Frazier and Allen) breached their fiduciary duty of care by acting recklessly.

Director Defendants argue that they did not breach their fiduciary duties because they reasonably relied on the reports of Officer Defendants and other professionals. However, Directors may not rely on the reports of Officer Defendants if there is good reason to doubt the validity of those reports. In this case, evidence was presented that there was ample reason to doubt the Officer Defendants' reports to the Board. For example, the Board knew that Defendant Causey did not hire a nursing home administrator with the funds that had been given for that purpose. This is important, because Defendant Causey was filling many roles within Lemington affiliated entities, and a separate nursing home administrator may have ensured that an individual was focusing solely on the quality of care being provided at the Home. As to

Defendant Shealey, he never provided the Board with appropriate financial information because the information did not exist. Evidence was presented that Defendant Shealey only kept a spreadsheet with a running bank balance and no general ledger.

A jury verdict for Plaintiff is supportable on this Count because it was unreasonable for the Board to rely upon such information given by Officer Defendants. *Cf. Pereira v. Cogan*, 2001 WL 243537 (S.D.N.Y. Mar. 8, 2001) ("sustained patterns of inattention to obligations by directors . . . or unreasonable blindness to problems that later cause substantial harm will create exposure to liability") (citing American Law Institute, *Principles of Corporate Governance: Analysis and Recommendations* § 401 at 155 (1994); *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274 (2d Cir. 1986)).

Furthermore, Director Defendants ignored the advice given by counsel regarding the legal implications that were involved with sending out notice to the Home's residents and to state agencies and instead unreasonably persisted on relying upon Officer Defendants' reports. P-131. The evidence presented at trial supports the jury's finding that the Board relied on incapable officers, and thus, the Board's actions were reckless and breached their fiduciary duty of care.

Evidence of the Board's recklessness was also supported by their lack of oversight of Officer Defendants. The Board had sufficient reason to know that they should have questioned the reports that Officers made at Board meetings. However, the extent of the Officer Defendants' deficiencies may not have been known because appropriate actions were not taken, *i.e.*, setting up a finance committee as required by the Home's bylaws. Violating the Home's bylaws goes beyond basic negligence and meets the recklessness standard. This evidence, when viewed in the light most favorable to Plaintiff, establishes that there was sufficient evidence to support the jury's finding that Director Defendants breached their fiduciary duty of care.

Therefore, Director Defendants' Motion for Judgment as a Matter of Law with respect to duty of care will be denied.

### b. Officer Defendants

In order to prove that Officer Defendants breached their duty of care, Plaintiff was required to establish that Defendants Shealey and Causey did not act "with such care, including reasonable inquiry, skill[,] and diligence, as a person of ordinary prudence would use under similar circumstances." *Lemington I*, 2010 WL 4275252 at *7 (citation omitted).

### i. Defendant Causey

There was more than sufficient evidence to support the jury's verdict that Officer Defendants breached their duty of care. As to Defendant Causey, evidence was presented indicating that she failed to properly manage the Home in her position as nursing home administrator. One patient went 20 days without her medication. Doc. No. 651, 27. Medical records for other patients did not have complete information to ascertain whether the patient had received the correct medication. A reasonable inference is that this lack of record management contributed to the Home's failure to collect the total amount that should have been billed to Medicare and Medicaid, which increased its insolvency. Inspectors also found numerous other violations at the Home, and Defendant Causey was aware of these deficiencies because she discussed them with the Board. The number of deficiencies remained high throughout her term as nursing home administrator.

The lack of quality care at the Home resulted in the patient census continuing to decrease, even before it was determined that the Home should be closed, which resulted in financial hardship for the Home and increased debts. The jury heard evidence that: (1) Defendant Causey also failed to keep minutes of the Board meetings, which was her responsibility under the

Board's practices; (2) Defendant Causey did not properly oversee Defendant Shealey or his actions; and (3) Defendant Causey was unaware that Defendant Shealey was not keeping the required financial records or billing Medicare and Medicaid for services that the Home was providing. A reasonable conclusion is that these actions left the Home in dire need of funds and ultimately led to the Home being forced to file for bankruptcy. A single one of the actions outlined above would be sufficient for a jury to find that Defendant Causey had breached her duty of care. When taken together, in the light most favorable to Plaintiff, this evidence provides overwhelming support for the jury's finding that Defendant Causey breached her fiduciary duty of care.

## ii. Defendant Shealey

As to Defendant Shealey, evidence was presented that the main duty of a chief financial officer ("CFO") is to keep accurate financial records. The jury was presented with evidence of Defendant Shealey's lack of recordkeeping. Defendant Shealey did not keep a general ledger, and, instead, kept a running bank balance via an Excel spreadsheet. Doc. No. 650, 111. Taken in the light most favorable to Plaintiff, Defendant Shealey failed to properly bill Medicare and Medicaid for services that the Home had provided, which prevented the Home from receiving much needed funds to sustain operations. Defendant Shealey's lack of proper recordkeeping played a role in at least one potential buyer's, UPMC, decision not to purchase the Home. Doc. No. 654, 44-45. When a financial advisor came to investigate the Home's financial condition, Defendant Shealey locked his door, and stayed inside his office, instead of speaking to the representative. Doc. No. 650, 110. A reasonable conclusion is that if the Home was purchased, it could have prevented the Home from entering into bankruptcy or, at the very least, allowed the Home to emerge from bankruptcy after having paid its creditors. These actions provide grounds

for a finding by the jury that Defendant Shealey breached his fiduciary duty of care. When taken as a whole, and viewed in the light most favorable to Plaintiff, this evidence supports the jury's finding that Defendant Shealey breached his fiduciary duty of care.

Accordingly, there was sufficient evidence that Officer Defendants breached their fiduciary duty of care, and Officer Defendants' Motion for Judgment as a Matter of Law with respect to duty of care will be denied.

### 3. Duty of Loyalty – Count I

This Court granted Defendants' Motion for Summary Judgment on the duty of loyalty, Count I. *Lemington I*, 2010 WL 4275252 at *8-10. On appeal, the United States Court of Appeals for the Third Circuit reversed, holding that there was sufficient evidence for the duty of loyalty claim to proceed to trial. *Lemington II*, 659 F.3d at 290-93. At the close of Plaintiff's case-in-chief, the Court granted Director Defendants' Motion for Judgment as a Matter of Law with respect to the duty of loyalty claim. Doc. No. 585. However, the Court denied Officer Defendants' Motion for Judgment as a Matter of Law with respect to the duty of loyalty claim. Id. Therefore, this post-trial motion only pertains to Officer Defendants.

In order to prove a breach of the duty of loyalty by Officer Defendants, Plaintiff was required to show that they "utilize[d] their position[s] to obtain any personal profit or advantage other than that enjoyed by [others]." *Lemington I*, 2010 WL 4275252 at *7 (quoting *Tyler v. O'Neill,* 994 F. Supp. 603, 612 (E.D. Pa. 1998)). Officer Defendants argue that Defendants Shealey and Causey did not "partake in any self-dealing that caused them to be unjustly enriched," and therefore, they did not breach their duty of loyalty, but this argument is without merit. Doc. No. 665, 16.

*a. Defendant Causey*

As to Defendant Causey, evidence was presented that she put her own personal gain before the Home's best interest. The parties stipulated that she received her full salary during 2004. Doc. No. 597, ¶ 37. However, during this time, Defendant Causey was not working full-time as required by law. Defendant Causey being paid for full-time work, while working part-time, supports a finding of unjust enrichment. The jury heard that these absences caused grievous harm to the Home because there was no licensed nursing home administrator on duty to ensure that patients were receiving the appropriate medical treatment or that the CFO, Defendant Shealey, was receiving proper oversight, including properly billing Medicare and Medicaid. Furthermore, the jury heard evidence that Defendant Causey failed to hire a nursing home administrator with funds that were provided, but instead, spent the funds as she saw fit. As discussed, these actions caused the Home's census to decrease and the debts to increase.

*b. Defendant Shealey*

As to Defendant Shealey, evidence was presented that he put his own interest before the Home's. One of his co-Defendants, Director Defendant Baldwin, testified at trial that he believed that the actions taken by Defendant Shealey were in Defendant Shealey's best interests, not those of the Home. Doc. No. 650, 213. Defendant Baldwin's testimony was supported by the testimony of Rev. Curtis, of Mt. Ararat Church, Defendant Shealey's pastor, and by the documentary evidence relating to the proposal to have Mt. Ararat Church purchase the Home. Doc. No. 655, 19-32. Although evidence was not presented that Defendant Shealey received any tangible financial benefit, his actions could reasonably be seen as an opportunity to receive a direct financial benefit in the future. Thus, his unjust enrichment was the chance of a future financial gain. This unjust enrichment was at the Home's detriment. Evidence was presented

that potential buyers such as UPMC did not purchase the Home, in part, because of the condition of the books. No due diligence book was kept for potential buyers. Other buyers were not sought. A reasonable conclusion is that Defendant Shealey's main focus was convincing his church to purchase the Home, which prevented the Home from finding a suitable buyer to ensure creditors were paid.

In sum, the evidence presented at trial supports the jury's finding that the Officer Defendants were concerned with their own self-interest and not with the Home's financial condition. This supports a verdict against Officer Defendants as to their fiduciary duty of loyalty. Accordingly, Officer Defendants' Motion for Judgment as a Matter of Law with respect to the duty of loyalty will be denied.

### 4. Punitive Damages

Punitive damages were assessed against seven Defendants (5 Directors and both Officers). Defendants argue that there is no evidence to support the punitive damages award. Under Pennsylvania law:

> Punitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct shows either an evil motive or reckless indifference to the rights of others. Punitive damages are appropriate when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct.

*Weston v. Northampton Pers. Care, Inc.*, 62 A.3d 947, 961 (Pa. Super. 2013) (citation omitted). Plaintiff must prove that the actions of each Defendant against whom punitive damages are assessed rises to the requisite level of conduct.

Defendants first argue that they are entitled to judgment as a matter of law with respect to punitive damages because they are entitled to judgment as a matter of law with respect to deepening insolvency, which they argue is the only claim for which Plaintiff could have

recovered punitive damages.  However, this argument fails because this Court has declined to grant judgment as a matter of law with respect to the deepening insolvency cause of action.

### a. Director Defendants

Defendants argue that it is unreasonable to assess punitive damages against only five Director Defendants because five directors did not constitute a quorum.  This argument lacks support in the law and logic.  Defendants correctly argue that punitive damages must be analyzed as to each individual.  However, implicit in their argument is the assertion that if evidence does not support punitive damages against a sufficient number of Director Defendants to constitute a quorum, that no punitive damages may be awarded against any Director Defendant.  This eliminates the individualized assessment for which Defendants argue, and is required by the law.

As to the five Director Defendants against whom punitive damages were levied, all of them were responsible for the Home's oversight.  Evidence was presented that they were aware that Defendant Causey was not sufficiently performing her job as nursing home administrator but none of the Directors took any action to remove her from that position.  Doc. No. 650, 9.  As the parties have stipulated, in January 2005 the Board chose not to admit any more residents.  Doc. No. 597, ¶ 39.  The Board then chose to send letters to the residents informing them of the decision to close the Home, and sent letters to state agencies informing the agencies of that decision.  P-109-P-112.  This decision was made after the Board's own bankruptcy attorney had warned the Board that taking such action would cause the viability of the Home to plummet.  P-131.  The jury heard testimony that the Board never chose to seek bids on the Home from organizations that specialized in nursing home turnaround and that no due diligence book was ever created for potential buyers.  Doc. No. 654, 44.  The Home continued to accrue debts after these actions were taken, which Defendants reasonably should have known would damage the

Home's prognosis.

As to the specific Defendants, both Defendants Baldwin and Andiorio testified at trial. As chairman, Defendant Baldwin was engaged in almost all of the discussions that took place regarding what actions should be taken and when to take such actions. Defendant Andiorio knew the most about nursing home care and what actions needed to be taken by Defendants Causey and Shealey. She has a Ph.D. in Public Health and, in her position as an operating officer, three nursing home administrators reported to her. Doc. No. 655, 34, 38. Furthermore, she testified that Defendant Causey informed her of the decision not to work full-time at the Home, as required by law.

Next, Defendants Thompkins, Johnson, and Bullock contend that a punitive damages award against them is "arbitrary, capricious, and without any legal or factual support," because they were not mentioned, except for limited fleeting use of their names, during the course of trial. Both Defendants and Plaintiff made the decision not to call Defendants Thompkins, Johnson, and Bullock to testify and made the decision not to ask any questions of other witnesses regarding the conduct of those three Defendants. These were tactical decisions that the Court will not disturb on post-trial motions.

Further, Defendants Thompkins, Johnson, and Bullock ignore the fact that their names are contained numerous times throughout the exhibits that were entered into evidence and provided to the jury during deliberations. The exhibits in this case are contained within 14, three inch binders, each of which is filled with documents that mention Defendants Thompkins, Johnson, and Bullock. A detailed review of the exhibits that were admitted into evidence and were provided to the jury during deliberations demonstrates that Defendants Thompkins, Johnson, and Bullock received more correspondence relating to the closure of the Home than the

other Defendants against whom liability was imposed, but no punitive damages were assessed. Furthermore, these Defendants were active participants in the Board meetings as evidenced by the minutes of those meetings.

It was not unreasonable for the jury to place more weight on the voluminous documentary evidence than the testimonial evidence. Defendants do not cite any case law, and the Court is not aware of any, which holds that testimonial evidence is the only way to prove that punitive damages are appropriate. As the United States District Court for the Northern District of California has stated, "there is . . . no legal difference between written evidence in the form of exhibits or otherwise and oral evidence. [The jury] may believe . . . written against oral or oral against written, or some combination of oral and written." *Kaplan v. Burroughs Corp.*, 426 F. Supp. 1328, 1336 (N.D. Cal. 1977). Documentary evidence in many respects is more reliable than evidence that is given orally. This is even more apparent in this case. Most of the questions that were asked at trial centered on events that happened eight or nine years prior. Memories fade with time and certainly it is difficult to remember the contents of a conversation that occurred nine years ago. This is evidenced by the testimony of Defendant Baldwin. Throughout his cross-examination, he repeatedly stated that he could not remember what occurred in 2004 and early 2005. See generally Doc. No. 650, 166-225.

The jury's decision not to assess punitive damages against Director Defendants who had received comparatively little correspondence was reasonable. The evidence supports the jury's finding that the five Director Defendants against whom they assessed punitive damages may have had had actual notice of deficiencies and thus, acted recklessly because they did not take any corrective action. Accordingly, when the record is viewed in the light most favorable to Plaintiff, as is required when considering a Rule 50 motion, the jury's decision to award punitive

damages against five Director Defendants is supported by sufficient evidence.

*b. Officer Defendants*

As to Defendant Causey, there is ample evidence to support a finding that her actions were of an "outrageous nature." Weston, 62 A.2d at 961. The lack of oversight on her part was evident in the lack of medical recordkeeping. One resident was not given her medicine for 20 days and Defendant Causey, as the nursing home administrator, was responsible for ensuring that residents received proper care. Defendant Causey chose not to hire a new nursing home administrator with a grant that the Home received for that purpose. Doc. No. 650, 5. She failed to complete required forms to receive reimbursements which led to increased insolvency. Doc. No. 649, 89-90. She was not working at the Home full-time as required by law. Doc. No. 650, 6-8. Defendant Causey contends that although she was not physically present at the Home for 40 hours a week, she worked many hours at home. The jury's decision to give little, if any, weight to Defendant Causey's testimony that she completed much of her work at home is supportable, especially considering that she had previously sworn under oath that she was not working full-time in order to receive state benefits. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 n.8 (3d Cir. 2009) (the Court may not disturb credibility determinations made by the jury).

As to Defendant Shealey, the jury heard evidence that he failed to properly bill Medicare, which was a large part of the Home's revenue stream. Doc. No. 649, 90; Doc. No. 650, 197. Defendant Shealey testified during trial that he refused to communicate or assist a financial advisor from one of the debtors on site who was investigating the Home's financial condition, and instead stayed inside his locked office. Doc. No. 653, 69. Defendant Shealey also failed to keep the appropriate financial records for an extended period of time. Doc. No. 650, 111. He failed to seek serious bidders for the Home and instead, focused on a plan to have his church

purchase the Home. Doc. No. 655, 19-32. Defendant Shealey also admitted to comingling the funds of the Home with other affiliated Lemington entities. Doc. No. 653, 20. Based upon the testimony and exhibits, there was ample evidence to support an award of punitive damages for his conduct.

In sum, the record supports the jury's finding that the seven Defendants (five Director Defendants and both Officer Defendants) against whom punitive damages were awarded acted in an outrageous manner. A detailed review of the documentary evidence supports the jury's finding that those five directors were the most culpable of the Board members and that their actions could warrant punitive damages. Accordingly, Defendants' Motion for Judgment as a Matter of Law with respect to punitive damages will be denied.

### 5. Conclusion

In their Motion for Judgment as a Matter of Law, Defendants ask this Court to remedy numerous of defense counsels' tactical decisions made during trial, which the Court is not permitted to do when considering a Rule 50 motion. The evidence at trial, which consists of both witness testimony and documentary evidence, supports the jury's verdict when considered in the light most favorable to Plaintiff. *See Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009). Accordingly, Defendants are not entitled to judgment as a matter of law on any issue that the Court submitted to the jury.

### III. New Trial – All Counts

#### A. Standard of Review

Federal Rule of Civil Procedure 59(a) provides, in pertinent part, that, "the [C]ourt may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial,

for any reason for which a new trial has heretofore been granted in an action at law in federal court." The decision to grant or deny a new trial is within the sound discretion of the District Court and, unlike the standard for determining a motion for judgment as a matter of law, the Court need not view the evidence in the light most favorable to the verdict winner. *See Allied Chem. Corp. v. Darflon, Inc.*, 449 U.S. 33, 36 (1980); *Radwan v. Carteret Bd. of Educ.*, 62 F. App'x 34, 37 (3d Cir. 2003).

As noted, Rule 59(a) does not specify grounds upon which a Court can grant a new trial and the decision is left to the discretion of the District Court. *See Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992). The Court may grant a new trial where: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly-discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *Univ. of Pittsburgh of Commw. Sys. of Higher Educ. v. Varian Med. Sys., Inc.,* 877 F. Supp. 2d 294, 304 (W.D. Pa. 2012) (citing *Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584 (D. N.J. 1997)). Other common reasons to grant a new trial include when there has been prejudicial errors of law, such as erroneous evidentiary rulings and/or jury instructions. *Id.* (citing *Maylie v. Nat'l R.R. Passenger Corp.*, 791 F. Supp. 477, 480 (E.D. Pa. 1992)). The standards of review differ depending on whether the motion for a new trial is based on a prejudicial error of law or a verdict that is against the weight of the evidence. *See Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993).

"A [C]ourt's latitude in ruling on the motion is especially broad when the grounds asserted in the motion concern matters that initially rested within the discretion of the [D]istrict [C]ourt." *Jacobson ex rel. Jacobson v. BMW of N. Am., LLC*, 376 F. App'x 261, 264 (3d Cir.

2010). "Rulings on evidentiary matters and the content of instructions to the jury are two such discretionary matters." *Id.* A motion for a new trial should be granted on evidentiary rulings *only* where *substantial* errors occurred in admission or rejection of evidence. *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 180 (3d Cir. 2000) (emphasis added). The same standard applies with respect to the District Court's decisions on jury instructions. *Cf. Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 78 (3d Cir. 2009) (holding that the propriety of jury instructions are reviewed under an abuse of discretion standard, granting deference to the District Court).

### B. Discussion

#### 1. Weight of the Evidence

Defendants argue that the weight of the evidence is such that a miscarriage of justice will occur if the jury's verdict is not disturbed. For all of the reasons previously set forth in the discussion regarding Defendants' Motion for Judgment as a Matter of Law, even when the evidence is viewed under a Rule 59 standard (instead of the more deferential Rule 50 standard), the Court finds that the jury's verdict is not against the great weight of the evidence and does not constitute a miscarriage of justice nor does it "shock[] the conscience," such that a new trial is warranted.

#### 2. Verdict Form

Defendants argue that the Court committed harmful error by not including a question regarding causation on the Verdict Form. However, the Court instructed the jury orally, and in the written copy of the Final Jury Instructions that were provided to each juror throughout deliberations, that in order to award damages to Plaintiff they must find that Defendants' actions caused damages to the Home. The Court instructed the jury, in pertinent part, that:[5]

---

[5] Quoted portions of the jury instructions in this Opinion are from the written instructions.

### Factual Cause

A Defendant Director or Officer will be legally responsible for the damages suffered by Plaintiff if the Defendants' negligence or intentional misconduct was a factual cause of those damages. To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm.

If the damages in question would have been sustained even if the agent or fiduciary had not been negligent or acted wrongfully, then the Defendants' conduct would not be the factual cause of the Plaintiff's damages. On the other hand, the Defendants' negligence or intentional misconduct was the factual cause of Plaintiff's damages if those damages would not have been sustained had Defendants not acted as they did.

### Proximate Causation

In a negligence action such as this, it is incumbent upon Plaintiff to establish a causal connection between a breach of some duty owed to Plaintiff and Defendants' conduct, and Plaintiff must also show that Defendants' conduct is the proximate cause of Plaintiff's injury.

Proximate causation is defined as a wrongful act that was a substantial factor in bringing about the Plaintiff's harm. Proximate cause does not exist where the causal chain of events resulting in Plaintiff's injury is so remote as to appear highly extraordinary that the conduct could have brought about the harm.

Doc. No. 596, 26-27. Consistent with the United States Supreme Court's pronouncement in

*City of L.A. v. Heller*, 475 U.S. 796, 798 (1986), the United States Court of Appeals for the Third

Circuit "presume[s] that juries follow instructions." *Hill v. Reederei F. Laeisz G.M.B.H.,*

*Rostock*, 435 F.3d 404, 425 (3d Cir. 2006) (Rendell, J. concurring) (citing *Citizens Fin. Group,*

*Inc. v. Citizens Nat. Bank of Evans City,* 383 F.3d 110, 133 (3d Cir. 2004)). Thus, it is presumed

that the jury found that Plaintiff proved that Defendants' actions caused the damages they

awarded.

Defendants' position would require that every element of every cause of action be

---

Although the verbal instructions varied slightly, the substance was the same and each juror had a copy of the written instructions as the Court was reading them and were permitted to take their individual copies into the jury room during deliberations.

included on a verdict form instead of being explained to the jury via final jury instructions.  The

United States Court of Appeals for the Third Circuit has previously rejected Defendants'

argument.  In *Kant v. Seton Hall Univ.*, the United States Court of Appeals for the Third Circuit

held that an instruction on causation was sufficient and that the verdict form need not explicitly

include a causation question when an instruction on causation is given.  279 F. App'x 152, 160

(3d Cir. 2009).  The Court held that "the verdict sheet was 'adequate to determine the factual

issues essential to the judgment.'"  *Id.*  (quoting *McNally v. Nationwide Ins. Co.*, 815 F.2d 254,

266 (3d Cir. 1987)).  Other United States Courts of Appeals have held likewise.  *See Burgess v.*

*Premier Corp.,* 727 F.2d 826, 831 (9th Cir. 1984); *Miley v. Oppenheimer & Co.*, 637 F.2d 318,

334 (5th Cir. 1981) (citing 5A Moore's Federal Practice § 49.03(1)) ("No party is entitled to a

special verdict on each of the multi-faceted, multitudinous issues essential to the resolution of a

given case").

Defendants cite *Fritz v. Wright*, 907 A.2d 1083 (Pa. 2006) in support of their position.

However, Defendants' argument is flawed for two reasons.  First, *Fritz* does not stand for the

proposition that "[a]n interrogatory on each contested element is necessary."  Doc. No.  665, 18.

Footnote 2 of *Fritz*, which Defendants cite, only lists the interrogatories that the jury answered in

the case.  *Fritz*, 907 A.2d at 1085 n.2.[6]  This case does not state any general rule with regard to

---

[6] Footnote 2, in its entirety, stated:
   Specifically, the questions were:
   1. Do you find [Appellees] were negligent?
   2. Was [Appellees'] negligence a substantial factor in causing Appellant harm?
   3. Was [Appellant] contributorily negligent?
   4. Was [Appellant's] contributory negligence a substantial factor in bringing about
      his harm?
   5. Taking the combined negligence that was a substantial factor in bringing about
      [Appellant's] harm as 100 percent, what percentage of that causal negligence was
      attributable to [Appellees] and what percentage was attributable to [Appellant]?

which questions must be included on a verdict slip.

In discussing jury interrogatories, the Pennsylvania Supreme Court stated that "[a] party is not entitled to have special interrogatories submitted to the jury." *Id*. at 1092 n.8. Thus, the jury does not have to answer questions about each element of a cause of action in Pennsylvania. The trial court is vested with the authority to use a general verdict instead of a general verdict with special interrogatories. Furthermore, the Court held that:

> [r]egardless of whether the jury is delivering a general verdict or general verdict with special findings, its deliberation will encompass all aspects of the case that are necessary to arrive at a decision. These aspects do not change depending on whether the jury is asked to discuss them orally before writing its general verdict or set forth the components of such discussion through answers to special interrogatories.

*Id*. at 1092. That is what occurred in this case. This Court included a detailed causation instruction in the Final Jury Instructions and thus chose to have the jury discuss the issue of causation orally prior to rendering a decision on damages. The decision in *Fritz* fully supports the steps that this Court took in crafting a verdict form.

Second, Defendants' argument fails because it relies on an incorrect premise – that verdict forms are substantive law and not procedural law. The well-settled *Erie* doctrine was announced in the seminal case of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). "Classification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor." *Id*.

---

6. State the amount of damages, if any, sustained by [Appellant] as a result of the accident, without regard to and without reduction by the percentage of causal negligence, if any, that you have attributed to him. The Court will perform the mathematical reduction based on the figures the jury supplies in this Verdict Slip.

7. State the amount of damages, if any, sustained by [ ] Darla Fritz.

*Fritz*, 907 A.2d at 1085 n.2 (alterations in original) (citation omitted).

(footnote omitted) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945)).

The United States Court of Appeals for the Seventh Circuit has held that if a state does not have separate rules governing the use of general verdicts versus the use of special verdicts, depending on the claim, then the decision about the contents of the verdict slip is a procedural question governed by federal law and not a substantive question governed by state law. *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 449 (7th Cir. 2000). In Pennsylvania, the rule on the use of verdict forms is general. *See Fritz*, 907 A.2d at 1091-92 (citing Pa. R. Civ. P. 2257). Likewise, the United States Court of Appeals for the Tenth Circuit has held that "district court[s are] not required to follow [state] guidelines for verdict forms because federal, not state law, governs the submission of special verdicts or interrogatories." *Schultz v. Rice*, 809 F.2d 643, 650-51 (10th Cir. 1986) (citing *Bartak v. Bell-Galyardst & Wells, Inc.*, 629 F.2d 523, 528 (8th Cir. 1980)).

Because verdict forms are procedural law and not substantive law, federal law, and not state law, is applicable. Therefore, any holding in *Fritz* with respect to verdict forms is not binding on this Court. Under federal law, the decision of whether to use special interrogatories is left to this Court's discretion. *See Kant*, 279 F. App'x at 160; Fed. R. Civ. P. 49. Accordingly, the Court did not err by refusing to include a question regarding causation on the Verdict Form.

### 3. Evidentiary Rulings

Defendants argue that five[7] evidentiary rulings of the Court merit a new trial.  These issues will be addressed seriatim.

#### a. Proofs of Claim

Defendants argue that the Court should have barred the admission of the amount of proofs of claim that have been filed in the underlying bankruptcy proceeding.  This issue was extensively briefed in this Court's pre-trial proceedings.  One hundred seventy-eight (178) proofs of claim were filed in the underlying bankruptcy.  *In re Lemington Home for the Aged*, 05-24500, slip op. at 1 (Bankr. W.D. Pa. Jan. 20, 2012).  Officer and Director Defendants separately filed objections to nearly every one of those proofs of claim.  *Id*. at 2.  In total, 334 objections were filed.  *Id*.  The only proofs of claim to which no objections were filed were those proofs of claim filed by Officer Defendants.  *Id*. at n.2.  The United States Bankruptcy Judge, Judge Deller, found that the tactics of defense counsel bordered on unethical and thus ordered them to either withdraw or amend the objections.  *See id.*  Judge Deller then found that defense counsel failed to comply with his previous Order and again threatened defense counsel with sanctions.  *Id*. at 8.  Subsequently, the Bankruptcy Court overruled all of the objections by both the Officer and Director Defendants as withdrawn.  *In re Lemington Home for the Aged*, 05-24500, (Bankr. W.D. Pa. Jan. 30, 2012).  Thus, when the stay was lifted after the United States Court of Appeals

---

[7] The Court will address the two separate challenges to the admissibility of the proofs of claim together because they are in essence one argument with two separate prongs. Defendants raised two other arguments in their Motion (Doc. No. 646) which are not addressed in their brief (Doc. No. 665).  In particular, Defendants objected to the Court's rulings on Motions in Limine relating to the testimony of James Hunt and John Kaye.  Id. at 12.  The failure to advance these arguments in their brief constitutes a waiver.  *See Galvin v. EMC Mortg. Corp.*, 2013 WL 1386614, *1 (D. N.H. Apr. 4, 2013) (under "raise-or-waive rule," represented parties must "incorporate all relevant arguments in the papers that directly address a pending motion" or waive them) (quoting *Iverson v. City of Boston*, 452 F.3d 94, 103 (1st Cir. 2006)).

for the Third Circuit denied mandamus relief, there were no objections to the proofs of claim pending in the Bankruptcy Court.

Before the withdrawal of the objections to the proofs of claim, Defendants moved to preclude evidence of the proofs of claim at trial and the Court denied that Motion. Doc. No. 408, ¶ 8. After the withdrawal of the proofs of claim, Plaintiff moved to admit evidence of the proofs of claim, and the Court granted that Motion. Text Order of 1/10/2013.

A proof of claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Federal Rule of Bankruptcy Procedure 3001(f) states that, "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Defendants do not cite any legal authority for the proposition that the proofs of claim must be excluded. Doc. Nos. 342 & 648. Instead, they argued that the proofs of claim could not be a floor for damages (*i.e.*, the minimum damage amount if the jury found Defendants liable). The Court agreed with Defendants and required Plaintiff to prove causation. Doc. No. 511. The Court then instructed the jury on causation. *See supra*, section III(B)(2).

The Court finds *Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.)*, 389 B.R. 390 (Bankr. D. Del. 2008), to be instructive. Upon remand, the Bankruptcy Court held that:

> [t]he District Court's concern about the Court's use of the claims docket as a measure of the Trustee's damages is unfounded . . . . The claims docket reflects all proofs of claim filed by pre-petition (and therefore pre-Closing Date) creditors . . . . a properly filed proof of claim is prima facie evidence of the validity and amount of that claim.

*Id*. at 394 (citing Fed. R. Bankr. P. 3001(f)). Although the Bankruptcy Court in *Quintus* used the proofs of claim as a replacement for the books and records of the company, the case supports the proposition that proofs of claim are an accurate measure of damages that can be relied upon by the jury.

Defendants also argue that no testimony linked the proofs of claim to the conduct of the Defendants. However, Defendants ignore the testimony of Mr. John Kaye, Plaintiff's expert. Mr. Kaye's testimony directly linked the proofs of claim to the conduct of Defendants, because he testified that the proofs of claim would not have been filed but for the actions of Defendants. Doc. No. 654, 62-63.

Defendants further argue that the proofs of claim are hearsay. However, Fed. R. Bankr. P. 3001 overrides any claim that the hearsay rules bar the admissions of the proofs of claim. The only cases cited by Defendants do not address Fed. R. Bankr. P. 3001. Instead, the cases address the matter of damages generally. The decision by the United States Bankruptcy Court for the District of Delaware in *Quintus* supports this Court's decision to admit the proofs of claim into evidence. Accordingly, the Court did not err by allowing the proofs of claim to be entered into evidence and Defendants' Motion will be denied in this respect.

*b. Damages Prior to April 13, 2001*

Defendants argue that the Court should have banned evidence of monetary damages that were incurred prior to April 13, 2001 (four years prior to the underlying bankruptcy being filed), because such damages are barred by the statute of limitations. Although the Court denied Defendants' Motion in Limine relating thereto, Plaintiff did not introduce any evidence regarding damages prior to April 13, 2001. Therefore, any alleged error was harmless. Defendants' argument is based upon the premise that because certain proofs of claim that were filed in the underlying bankruptcy, and relied upon by Plaintiff in arguing for damages, were based upon debts incurred prior to April 13, 2001, those proofs of claim represent damages that occurred prior to that date. However, that is factually and legally inaccurate.

Plaintiff presented evidence at trial that the Home was still viable in 2004 and 2005.

Plaintiff argued that the actions taken (and not taken) by Defendants during that time period resulted in the Home filing for bankruptcy and being unable to pay its ever increasing debts. Thus, the date on which the damages occurred, according to Plaintiff and as accepted by the jury, was well after April 13, 2001. The jury found that the Home would have had sufficient funds to pay the debts that had accumulated (some for events prior to April 13, 2001) but for the actions of Defendants after April 13, 2001. In sum, Defendants confuse the date on which the damages occurred and the date on which an underlying claim arose. The date on which the underlying claim arose is immaterial. Accordingly, the Court did not err by allowing underlying claims that occurred prior to April 13, 2001, to be admitted into evidence because the damages did not occur until well after that date, and within the statute of limitations.

### c. Testimony of Larry Jennings and Non-Recourse Note

Defendants argue that the Court should not have permitted Larry Jennings to testify. However, Larry Jennings did not testify at trial. Therefore, any alleged error in allowing Mr. Jennings to testify was harmless and the Court will not address this further.

Defendants also argue that the Court should have barred introduction of the non-recourse note for the Home's property. Touchstone, a lienholder, has asserted a claim against the Home in the amount of $3.6 million, the amount remaining on the mortgage. The mortgage is secured by the Home's building. Defendants cite a state court case in support of their argument, but ignore the applicable provision within the Bankruptcy Code, 11 U.S.C. § 1111(b)(1)(A), which provides that: "[a] claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . ." Furthermore, Defendants ignore the economic reality of the situation. The property that secured

the note could have been used to satisfy other creditors who had claims against the Home if the property did not have to be sold in order to satisfy the non-recourse note. Thus, the non-recourse note was relevant to the jury's determination of damages. Accordingly, the Court did not err by allowing the non-recourse note to be admitted into evidence.

### d. Closing Argument of Plaintiff's Counsel

Defendants argue that the Court should have sustained their objection to the statements made by Plaintiff's counsel in his closing statement relating to the payment of the Home's employees. The statements at issue are: (1) "It's also important to note that creditors were some of the employees of the Home at the very end . . . people that weren't compensated for that," Doc. No. 656, 38-39; (2) "employees . . . wouldn't be paid for that time [before the Home was closed,]" id. at 55; and (3) "employees that . . . weren't paid for [their work.]" Id. at 69.

First, the veracity of these statements is uncontested. As Defendants admit "it's accurate the employees are making claims for unpaid benefits such as accrued vacation or even portions of benefits through the pension . . . . " Id. at 75. This is evidenced by the membership of the Official Committee of Unsecured Creditors, which includes a representative from the Service Employees International Union. It was not unreasonable for Plaintiff's counsel to state that employees were not being paid for their time. Part of the pay for their time was vacation days and pension benefits. However, Defendants argue "that's a very different matter than actual salaries." Id. at 75-76. Plaintiff's counsel never referenced salaries during his closing statement. Thus, the distinction which Defendants are attempting to make is unconvincing.

Second, the jury was repeatedly instructed that the statements and arguments of counsel are not evidence. As part of the Preliminary Jury Instructions, the Court instructed the jury that, "[c]ertain things are not evidence and you must not consider them . . . . Statements, arguments,

and questions made by lawyers are not evidence." Doc. No. 545, 4. After closing arguments, the Court again instructed the jury that "[s]tatements, arguments, questions and comments by the lawyers are not evidence." Doc. No. 596, 6. Taken in context with the jury instructions given both before and after the evidence was presented, the statements made by Plaintiff's counsel during closing arguments were not prejudicial to Defendants. Accordingly, the Court did not err by overruling Defendants' objection to the closing argument of Plaintiff's counsel.

### e. Admission of Exhibits in Pre-trial Proceedings

As this Court does with all of the cases before it, both civil and criminal, the parties were ordered to produce a chart of all exhibits that either side intended to offer into evidence, with any objections to authenticity and/or admissibility being noted, and the offering party's response thereto. Doc. No. 316. In this case, the process was repeated several times. See, *e.g.*, Doc. Nos. 328, 331, 413, 421, 457. The parties then provided paper copies of the exhibits to the Court for review. Doc. No. 316. In this case, because of the mandate of the United States Court of Appeals for the Third Circuit, the Court took an additional step and held a conference that was focused on all of the disputed exhibits. Doc. No. 470. At that conference, the Court went through each exhibit that was objected to and discussed the party's reason for the objection and the response thereto before making a ruling on the exhibit's admissibility.

During the pre-trial process, Officer Defendants objected to this Court's process for ruling on the admissibility of exhibits, and the Court overruled that objection. *Official Comm. of Unsecured Creditors ex rel. Lemington Home for the Aged v. Baldwin (In re Lemington Home for the Aged) ("Lemington III")*, 2013 WL 452561 (W.D. Pa. Feb. 6, 2013). During trial, both Officer and Director Defendants objected to the admission of exhibits based upon the Court's rulings prior to trial and the Court again overruled the objections. Doc. No. 649, 69. Defendants

make no new arguments, and cite no new cases, as to why the process this Court has used for the past ten years is impermissible or improper. Thus, the following analysis, as has been previously discussed in *Lemington III*, 2013 WL 452561, is still applicable.

Defendants rely upon Fed. R. Evid. 104 for the proposition that final rulings made prior to trial are impermissible. However, Defendants disregard Fed. R. Evid. 103(b), which states that "[o]nce the court rules definitively on the record — either before or at trial — a party need not renew an objection or offer of proof to preserve a claim of error for appeal." The language regarding rulings made prior to trial was incorporated into Rule 103 in 2000. The Advisory Committee Notes for the 2000 Amendments addresses "definitive ruling[s]" made on evidentiary matters prior to trial. Advisory Committee Notes, 2000 Amendment, Fed. R. Evid. 103; *see United States v. Bonds*, 608 F.3d 495, 518 n.11 (9th Cir. 2010) (Bea, J. dissenting); *see also Franklin v. State*, 965 So.2d 79, 89 (Fla. 2007) (discussing the similar provision of Florida's Rules of Evidence). The language of the Rule is unambiguous. The Court can definitively rule on exhibits prior to trial.

Furthermore, Fed. R. Evid. 103(d) provides that "[t]o the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." If the Court had conducted the trial in the manner that Defendants propose, it would have been contrary to this Rule. The parties would have been able to suggest inadmissible evidence to the jury, the other party would have objected, and then the Court would have ruled on the record.

This practice would also render motions in limine less effective because the Court's rulings would be preliminary and parties would be able to re-raise any objection during trial. The Court is not aware of any District Court Judge within this District who declines to rule on

motions in limine until trial because of Fed. R. Evid. 104 and doing so would be inconsistent with Rule 1 of the Federal Rules of Civil Procedure. The process suggested by Defendants would have also unnecessarily extended the trial's duration. All pre-trial rulings would have been re-litigated during trial. This Court has a right to manage its docket in a manner that is judicially efficient. *See In re Baldwin*, 700 F.3d at 129.

Notably, Defendants do not cite any binding cases for the proposition that the Court's final pre-trial rulings on exhibit objections are impermissible under the Federal Rules of Evidence. Instead, Defendants rely upon a single, non-binding case from the United States Court of Appeals for the First Circuit that does not stand for the proposition for which Defendants cite it. Defendants rely on *Blake v. Pellegrino*, 329 F.3d 43 (1st Cir. 2003), for the proposition that Rule 104(a) only allows for preliminary ruling prior to trial. However, this is not the Court of Appeals' holding in *Blake*.

The issue in *Blake* related to a trial judge who ruled on the persuasiveness of a piece of evidence under the guise of Federal Rule of Evidence 104(a). *Id*. at 48. The United States Court of Appeals for the First Circuit held that a Judge could not exclude evidence solely because he found it to be unpersuasive. *Id*. The United States Court of Appeals for the First Circuit stated that "[R]ule [104] enables a trial judge to decide whether foundational facts have been established []and, thus, whether particular pieces of evidence are eligible for admission . . . ." *Id*. (citation omitted). Defendants argue that the use of the word "eligible" suggests that a ruling before trial cannot be final. However, in this context, "eligible" means that a party can choose not to move an exhibit into evidence, even if the Court has ruled that it is admissible.

The Court finds *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604 (3d Cir. 1995), which Defendants relied upon in their Petition for Writ of Mandamus, instructive.

In *Duquesne Light*, the United States Court of Appeals for the Third Circuit indicated that such rulings prior to trial were permissible. The Court in *Duquesne Light* held that trial limits were appropriate even if "each particular item of evidence offered" was not ruled on. *Id*. at 609 (quoting *SCM Corp. v. Xerox Crop.*, 77 F.R.D. 10, 13 (D. Conn. 1977)). Thus, it is reasonable to assume that time limits are permissible when each particular item of evidence is ruled upon. Setting time limits prior to trial, with knowledge of the rulings made on evidence, is only possible if the rulings were made prior to trial.

The Court did not indiscriminately rule on all questions of admissibility and authenticity prior to trial. The Court withheld ruling on four separate exhibits until an issue arose during trial because the Court was not able to determine if the exhibits were admissible on their face. Conversely, the objections to the other exhibits could be ruled upon based solely on the exhibit. For example, if a party objects to introduction of an exhibit based on hearsay, and it is evident from the exhibit that it is a business record, there is no need for the Court to wait until trial to rule on the objection. The same can be said for authenticity. If an objection to the authenticity of an exhibit is made, and the exhibit is self-authenticating, there is no reason for the Court to withhold ruling on the objection until trial.

Further, no ruling on the admissibility of an exhibit was truly "final" until the jury was charged and had begun deliberations. *Cf. Gibbons v. People*, 445 P.2d 408, 409 (Colo. 1968); *State v. Montjoy*, 366 N.W.2d 103, 107 (Minn. 1985); *Black v. State*, 362 S.W.3d 626, 634 (Tex. Crim. App. 2012) ("a trial court retains the authority to . . . revisit its pre-trial ruling thereon during the course of trial"). If it had become obvious during trial that an error was made regarding the admissibility of a particular piece of evidence, the Federal Rules of Evidence provide an adequate remedy. The Court could have stricken evidence that had previously been

admitted into evidence, and instructed the jury to disregard such evidence, or it may have admitted into evidence an exhibit that it had previously excluded. Defense counsel made no such motion as to any exhibit.

Finally, Defendants argue that thousands of pages of documents were admitted into evidence without having ever been identified or discussed during the trial. Taken to its logical conclusion, Defendants' argument is that every page of every document that is sent back with the jury has to be discussed by a witness on the stand. That is simply not the case. The Court is unaware of a single Judge, either in state or federal court, that requires every page of every document sent back with the jury to be mentioned during trial. It is common practice in every jurisdiction in which this Court practiced for over 35 years to admit documents into evidence without such testimony. Further, throughout the pre-trial process, the Court encouraged the parties to work together to "streamline" the case and the exhibits which would be given to the jury during deliberations. Although every page of every document was not discussed by a witness on the stand, the testimony during trial, when taken as a whole, provided an evidentiary foundation upon which the documents that were sent back with the jury were properly admitted into evidence. Accordingly, the Court did not err in following Defendants' preferred method for the admission of exhibits.

In sum, Defendants have not advanced any meritorious reason why a new trial should be granted. The weight of the evidence supports the jury's verdict, the Verdict Form was sufficient, and evidentiary rulings were fair and consistent with the Federal Rules of Evidence. Accordingly, there is no basis upon which to grant a new trial.

## IV. Remittitur

### A. Standard of Review

Federal Rule of Civil Procedure 59(e) permits the Court "to alter or amend a judgment." "[T]he remittitur is well established as a device employed when the [Court] finds that a decision of the jury is clearly unsupported and/or excessive." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 715 (3d Cir. 2010) (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)) (alteration in original). "[A]n aggrieved defendant need 'only' show that the other side's evidence did not justify the award." *William A. Graham Co. v. Haughey*, 646 F.3d 138, 142 (3d Cir. 2011). "Remittitur is discretionary with the trial court." *Brown v. McBro Planning & Dev. Co.*, 660 F. Supp. 1333, 1337 (D. Virgin Islands 1987) (citing *Kazan v. Wolinski*, 721 F.2d 911, 913–14 (3d Cir. 1983)).

### B. Discussion

Defendants first argue that no punitive damages should have been awarded. However, as discussed in section II(B)(4) *supra*, there was sufficient evidence for the jury to award punitive damages against the seven Defendants. The Court will not disrupt the jury's verdict. The Court thus turns to Defendants' argument that the amount of the award is excessive. The Court instructed the jury that:

> If you decide that the Lemington Home is entitled to an award of punitive damages, it is your job to fix the amount of such damages. In doing so, you may consider any or all of the following factors:
> 1. The character of the Defendant or Defendants' act;
> 2. The nature and extent of the harm to the Lemington Home that the Defendant or Defendants caused or intended to cause; and
> 3. The wealth of the Defendant or Defendants insofar as it is relevant in fixing an amount that will punish him or her, and deter him or her and others from like conduct in the future.

Doc. No. 596, 28-29. This instruction was taken verbatim from § 8.20 of Pennsylvania's

Suggested Standard Civil Jury Instructions.  Defendants argue that the punitive damages

awarded against seven of the Defendants should be reduced.  Because Defendants' argument

regarding a remittitur primarily concerns the third factor quoted above, the wealth of Defendants,

the Court will first address that factor.

### 1. Wealth

#### *a. Net Worth Chart Prepared by Defense Counsel*

In support of their Motion, Defendants rely upon a chart that defense counsel created,

after trial, which purports to set forth the net worth of those seven Defendants.  However, the

Court gives little weight to the chart presented by Defendants.

Prior to trial, Plaintiff moved the Court for permission to conduct discovery related to the

net worth of Defendants.  Doc. No. 462.  Defendants opposed this Motion.  Doc. No. 467.  The

Court granted the Motion and permitted the discovery to proceed.  Text Order of 1/10/13.  The

Court had detailed discussions with counsel, with the input of the Defendants, who were present

in the Courtroom, regarding how any such discovery would occur.  The Court ordered that any

chart that was produced outline the method for calculating the net worth listed.  Further, the

Court set a briefing schedule to resolve any disputes centering on the discovery relating to

Defendants' net worth.  No motions were ever filed relating thereto and the Court was not

provided with the chart until after trial.

At the final pre-trial conference, the Court was informed that it was unlikely that any net

worth information would be presented, by either side, during the course of trial and no such

evidence was ever presented during trial, either in documentary or testimonial form.  This was a

tactical decision made by both parties.  Presumably, Plaintiff and Defendants did not believe that

the net worth statements helped their case.  Defendants now realize that they may have made a

tactical error and attempt to disturb the jury's verdict by using the net worth evidence in their Motion for a Remittitur that they decided not to present at trial. However, the Court's role in considering the Motion for a Remittitur is to ensure that the amount of the award is supported by the evidence and not excessive, based upon the record created by the parties during trial, not a record created as part of the post-trial motions process.

First, the chart provided by Defendants (Doc. No. 668) does not comply with this Court's Order to detail how the net worth figures were tabulated. Instead, figures for four Defendants have no explanation and figures for the other three Defendants have explanatory phrases that are unclear. However, it is obvious from Defendants' brief in support of the Motion (Doc. No. 665), and the chart itself, that Defendants have confused the term net worth with source(s) and the amount(s) which can be recovered by Plaintiff. Net worth is defined as "[a] measure of one's wealth, usu[ally] calculated as the excess of total assets over total liabilities." *Black's Law Dictionary* 1747 (9th ed. 2009). In Pennsylvania, net worth is "a valid measure of [a defendant's] wealth" for purposes of punitive damages. *Sprague v. Walter*, 656 A.2d 890, 920 (Pa. Super. 1995).

Although Plaintiff may not be able to recover assets that are held jointly by a Defendant and his or her spouse (if any), Defendant's share of assets may properly be considered when determining the amount of punitive damages to award. *Viener v. Jacobs*, 834 A.2d 546, 561 (Pa. Super. 2003); *see United States v. Fumo*, 2013 WL 414441, *5 (3d Cir. Feb. 4, 2013) (net worth includes joint assets); *S.E.C. v. Church Extension of Church of Church, Inc.,* 429 F. Supp. 2d 1045, 1051 (S.D. Ind. 2005) (same); *Nelson v. State Bd. of Veterinary Med.*, 938 A.2d 1163, 1168 (Pa. Cmwlth. 2007) (same). Retirement accounts are also included in net worth calculations. *See, e.g., Fumo*, 2013 WL 414441 at *5; *United States v. Manning*, 526 F.3d 611,

612 (10th Cir. 2008); *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 306-07 (7th Cir.

2002); *Rodriguez v. Comm'r*, 51 T.C.M. (CCH) 243, n.2 (1986); *S.B. v. G.B.*, 939 N.Y.S.2d 743

(Table) (Sup. Ct. 2011); *Milko v. Milko*, 2011 WL 4974825, *1 (Vt. Mar. 3, 2011) (*per curiam*).

It is therefore difficult for the Court to determine the true net worth of the seven

Defendants against whom punitive damages were assessed because the chart explicitly excludes

information that should have been included in net worth and there is no explanation about how

the values were calculated.

Thus, the Court finds that the chart prepared by Defendants should be given little weight

in determining whether a remittitur is appropriate. Defendants are attempting to have the Court

rectify their tactical error and then provided incomplete financial information is support of their

request for a remittitur. The Court declines to exercise its discretion and disrupt the amount of

the jury's punitive damages award because of this information. The Court now turns to the

merits of Defendants' argument.

### b. Wealth of Defendants as a Factor

Defendants argue that because Plaintiff chose not to present evidence of Defendants' net

worth, the amount determined by the jury is flawed. As discussed above, nothing prevented

Defendants from presenting this evidence at trial and therefore reducing the likelihood of an

excessive damages award if damages were indeed assessed. Furthermore, both state and federal

Courts in Pennsylvania have expressly rejected Defendants' argument. "[E]vidence of personal

wealth is not mandatory in the determination of punitive damages under Pennsylvania law."

*Holber v. Jacobs (In re Jacobs)*, 381 B.R. 147, 162 (Bankr. E.D. Pa. 2008) (citing *Viener*, 834

A.2d at 561); *Bair v. Purcell*, 2009 WL 772828, *14 (M.D. Pa. Mar. 17, 2009) (citations

omitted); *Vance v. 46 & 2, Inc.*, 920 A.2d 202, 207 (Pa. Super. 2007) ("In fact, we rejected the

defendant's position that wealth is a necessary prerequisite . . . the polestar for the jury's assessment of punitive damages is outrageous conduct of the defendants."); *Shiner v. Moriarty*, 706 A.2d 1228, 1242 (Pa. Super. 1998) ("we reject the suggestion that evidence of net worth is mandatory").  Thus, whether the amount of the punitive damages award is appropriate depends upon the other two factors relating to Defendants' actions.

## 2. Character of Defendants' Actions

The Court finds there was substantial evidence to support the jury's finding that the character of Defendants' actions was extraordinary, which supports a large punitive damages award.  A reasonable conclusion based upon the evidence is that Director Defendants' failure to oversee the Home's operations was more than just ignoring obvious signs of trouble.  Instead, the Board failed to heed its own bylaws by not having a finance committee to ensure proper oversight of the Home's finances.  The jury heard testimony that Director Defendants were aware that Defendant Causey was not working full-time as the nursing home administrator, as required by law, and took no action to ensure that a full-time nursing home administrator was present.  Doc. No. 650, 6.  Director Defendants personally chose not to keep minutes of Board meetings but instead relied upon the Home's staff to keep the minutes.

There is also substantial evidence that the actions of Officer Defendants were extraordinary.  As to Defendant Shealey, the jury heard that he failed to keep any appropriate financial records at all.  Furthermore, evidence was presented that Defendant Shealey affirmatively represented to the Board (which oversaw the finances of the Home) that there were accurate financial records being kept.  As previously discussed, Defendant Shealey avoided the financial advisor when confronted about the lack of financial records, which could reasonably warrant an assessment of significant punitive damages.

As to Defendant Causey, the jury heard that she, under oath, applied for and received disability payments and stated in the application, under oath, that she was not working full-time with full knowledge that the law required her to work full-time, and she was being paid as a full-time employee. A reasonable conclusion was that her lack of oversight of the Home's staff, including the lack of required medical records, placed the health of the Home's residents at risk and may have resulted in the death of one patient, which damaged the Home's well-being because they decided to stop admitting patients.

The Court finds that there was substantial evidence that the breaches that occurred went unnoticed for a significant period of time. Defendant Causey was not working full-time for an extended period. Defendant Shealey was not keeping books for an extended period of time. Director Defendants' oversight was lax for an extended period of time. Thus, it was not unreasonable for the jury to determine that there was a significant risk that the breaches would go unpunished. Therefore, it was also reasonable for the jury to award punitive damages in order to deter these Defendants and others from committing similar acts in the future.

### 3. Nature of Harm

Evidence was also presented that the nature and extent of the harm to the Home was significant. As Defendant Andiorio testified, the Home "was founded to take care of a population of African-Americans, primarily originally women. In today's world that [is] kind of a unique or a focused organization . . . ." Doc. No. 655, 55. Defendants' expert testified that he believed that the Home was the only "freestanding nursing home, nonprofit, dedicated exclusively to the mission of . . . servicing the African-American community with a Medicaid rate in excess of 90%." Id. at 184-85. The Home was an important part of the community, both because of the services it provided to poor African-Americans and because of its historical

significance.

The jury reasonably concluded that Defendants' actions injured the Home's financial position. The jury heard that this closure was a loss to the community for several reasons. First, the individuals that were still living in the Home were forced to re-locate to different nursing homes in the surrounding area. Furthermore, there is no longer a nursing home in the Lemington area that caters to elderly African-Americans. This has forced local residents to be placed in nursing homes further away from their families and in unfamiliar neighborhoods. Finally, the Lemington community lost a historic pillar of the community. As Defendant Causey stated, this was "devastating to our residents and to our employees and to the community." Doc. No. 654, 187.

### 4. Conclusion

In sum, it was reasonable for the jury to conclude that the $2,250,000 compensatory damages award against 15 of the 17 Defendants was not sufficient to punish the seven Defendants whom they found to be most culpable. Additionally, it was reasonable for the jury to conclude that the punitive damages awards were necessary to prevent Defendants and others from perpetuating similar wrongs in the future. After being instructed to try this case by the United States Court of Appeals for the Third Circuit, the Court finds no compelling reason to disturb the jury's verdict because they were rightfully the ultimate finders of fact.

## V. Conclusion

This Court faithfully followed the mandate of the United States Court of Appeals for the Third Circuit by presiding over a jury trial in this matter. The Court has considered all of Defendants' arguments, and finds them to be, collectively and individually, without merit. Accordingly, Defendants' Motion for Judgment as a Matter of Law, New Trial, or a Remittitur (Doc. No. 646) will be DENIED.[8]

An appropriate Order follows.

/s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All ECF counsel of record

---

[8] The parties objected to the jury rendering a verdict on the adverse domination theory and statute of limitations. Doc. Nos. 527, 529. Thus, the Court stated that "[t]hese issues will [be] addressed by the Court via post-trial motions." Doc. No. 534, ¶ 5. The Court then ordered all post-trial motions to be filed by April 25, 2013. Doc. No. 631. No party filed any post-trial motion related to these issues (other than the argument relating to damages prior to April 13, 2001, addressed *supra*). Thus, the Court finds that the parties have waived the right to raise these issues, other than the argument relating to damages before April 13, 2001.